

**FILE**
IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON

DATE **NOV 0 7 2019**

Fairhurst, CQ.
*CHIEF JUSTICE*

This opinion was
filed for record
at 8am on Nov 7, 2019

Susan L. Carlson
Supreme Court Clerk

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| THE STATE OF WASHINGTON, | ) | No. 96090-9 |
| Respondent, | ) | |
| | ) | En Banc |
| v. | ) | |
| | ) | |
| BISIR B. MUHAMMAD, | ) | Filed    **NOV 0 7 2019** |
| Petitioner. | ) | |

WIGGINS, J.—Bisir Bilal Muhammad was convicted of first degree rape and felony murder. Principally at issue is whether the trial court erred in denying Muhammad's motion to suppress the physical evidence collected from his vehicle after police located it via a warrantless cell phone "ping." Muhammad contends the location information provided by a cell phone ping is protected from a warrantless search under article I, section 7 of the Washington Constitution and the Fourth Amendment to the United States Constitution.

We agree. Seven members of the court agree that a ping is a search under article I, section 7 and the Fourth Amendment. *See* lead opinion of Wiggins, J.; opinion of Gordon McCloud, J.

Although the ping was a search conducted without a warrant, the ping was not impermissible. Rather, as six members of the court agree, the ping *was* permissible. *See* lead opinion of Wiggins, J. (concluding that the exigent circumstances exception justified the search); concurrence/dissent (Madsen, J.) (concluding that the ping was not a search and therefore was permissible).

Finally, five members of the court, in agreement with Muhammad, hold that imposing convictions for both felony murder predicated on rape and first degree rape violates double jeopardy. *See* concurrence/dissent (Madsen, J.); opinion of Gordon McCloud, J.

In light of the above, we therefore affirm the Court of Appeals in part and reverse in part. By a vote of six to three we agree the ping was permissible. *See* lead opinion of Wiggins, J.; concurrence/dissent (Madsen, J.). By a vote of five to four, this court holds that the felony murder and rape convictions violate double jeopardy and remands to the trial court to dismiss the lesser-included offense. *See* concurrence/dissent (Madsen, J.); opinion of Gordon McCloud, J.

## FACTS AND PROCEDURAL HISTORY

On a cold November morning, 69-year-old Ina Claire Richardson was found raped and strangled on a deserted road in Clarkston, Washington. Richardson's face, neck, and wrists displayed contusions and cuts; there were marks on her neck consistent with strangulation and debris on her hands, indicating she struggled with her attacker. Her genital area was bloodied and bruised. An autopsy

2

later revealed that Richardson's vaginal canal had been lacerated and torn by the forcible insertion of a blunt object.

The night she was killed, November 6, 2014, Richardson had shopped at a local grocery store. After Richardson had unsuccessfully asked multiple people for a ride home, external security cameras recorded her walking through the parking lot toward a distinctive maroon sedan. Minutes later, the vehicle's headlights switched on, and the vehicle exited the parking lot, drove onto an access road behind a nearby hotel, and parked near the service entrance. Two individuals appeared in the car, which remained parked for approximately one hour outside the service entrance. Police officers later discovered a condom wrapper at this location.

On November 10, 2014, a law enforcement officer recognized the unique features of the maroon sedan from the security footage and conducted a traffic stop. The driver was Bisir Muhammad. During the stop, the officer asked Muhammad about his vehicle, asked him whether he had gone to the grocery store or had been in the area on the night of the murder, and obtained Muhammad's cell phone number before letting him go. The police also learned that Muhammad's criminal history included a rape outside the state.

After this encounter, law enforcement sought and obtained a search warrant for Muhammad's car. While processing the warrant request, an officer was dispatched to surveil Muhammad. The officer observed Muhammad assist a woman, later determined to be his wife, into his car, drive to a local store, go inside,

3

and then return home. For reasons unknown, this officer suspended surveillance and left Muhammad's apartment complex. When the officer returned, Muhammad's vehicle was gone.

In response, the police "pinged"[1] Muhammad's cell phone without a warrant. The ping placed Muhammad in an orchard in Lewiston, Idaho. Washington and Idaho police arrived, seized Muhammad's cell phone, and impounded his car.

During his subsequent interview with police, Muhammad repeatedly changed his statements about the night of Richardson's murder. First, Muhammad said that he worked his usual dishwashing shift and drove straight home. When confronted with security camera footage contradicting this story, Muhammad eventually told the officer that he may have driven to a nearby store to cash a check but the store refused to cash it. The story again changed when Muhammad was told security footage showed he neither left his car nor entered the store. He then said he may have visited a friend at a nearby motel to smoke. The police confirmed with Muhammad's friend that the two did not meet that night.

Muhammad similarly denied seeing Richardson or that he had any contact with her on the night she died. While he admitted knowing of Richardson, having briefly worked at the grocery store where she shopped, Muhammad said he spoke

---

[1] "Pinging" is the "sending of a signal to identify the current location of a cell phone. The phone carrier can discern the location through cell-site locations [(CSL)] . . . . The carrier detects a general, not specified, area of the phone by CSL when the cell phone connects with a cell tower in order to initiate or receive a call. GPS [(global positioning system)] data reveals the exact location of the phone by revealing the phone's latitude and longitude coordinates." *State v. Muhammad*, 4 Wn. App. 2d 31, 42, 419 P.3d 419 (2018).

4

to her only once while in a group of other people. Video surveillance contradicted this statement. The footage shows that he exited the grocery store with Richardson, proceeded to speak with her alone, and leaned in and attempted to kiss her—an action that Richardson rebuffed.

Muhammad denied any involvement in the rape and murder and eventually asked for legal counsel.

Police later searched Muhammad's car. They discovered blood on the passenger seat; in the trunk, they found latex gloves, personal lubricant, and pornography. One witness testified at trial that Muhammad informed her that he and his disabled wife did not have sex.[2] The police also discovered condoms in the trunk of the sedan. These condoms matched the condom wrapper found by the hotel service entrance. The blood was matched to that of Ina Richardson. Autopsy swabs of Richardson's vagina and fingernails revealed a limited amount of DNA (deoxyribonucleic acid) matching Muhammad's profile.

The police obtained a search warrant for Muhammad's cell phone records. The records showed multiple calls to Muhammad's wife on the night Richardson was murdered. These calls connected to multiple cell towers, indicating that Muhammad was moving. One such cell tower placed Muhammad in the location where Richardson's body was found. Muhammad was arrested and charged with rape and felony murder.

---

[2] At trial, Muhammad challenged this testimony as hearsay. The court issued a written memo denying the motion to exclude these statements. He did not raise this issue here.

At trial, Muhammad moved to suppress all physical evidence collected as a result of the warrantless ping of his cell phone. After a CrR 3.6 hearing, the trial court issued a written order denying the motion based in part on exigent circumstances. A jury convicted Muhammad of first degree felony murder and first degree rape. The jury also found that Muhammad knew or should have known Richardson was particularly vulnerable. The court imposed an exceptional sentence of two terms totaling 866 months, to be served consecutively.

Muhammad appealed his convictions. *State v. Muhammad*, 4 Wn. App. 2d 31, 419 P.3d 419 (2018). Among other things, he argued that cell phone location data is a privacy interest protected by article I, section 7 and the Fourth Amendment and that the warrantless cell phone ping was improper. He also argued that exigent circumstances did not exist and that his convictions violated double jeopardy. The Court of Appeals declined to review the constitutional question, concluding that exigent circumstances justified the warrantless search. The court affirmed both convictions in a published decision.

Muhammad sought review here, which the State opposed. The State also urged us to consider whether the attenuation doctrine applies and whether any error in evidence collection was harmless. We granted review without limitation.

ANALYSIS

1. The trial court did not err by denying Muhammad's motion to suppress

Individuals have a constitutional privacy right to their cell phone location data. WASH. CONST. art. I, § 7. The warrantless ping of Muhammad's cell phone

would have been improper. However, six members of the court agree that the ping was permissible. The trial court therefore properly denied Muhammad's motion to suppress, and we decline to review the attenuation and harmless error arguments.

A. Both the state and federal constitutions protect cell phone location data from warrantless searches

The ubiquity of cellular devices in modern life has presented and continues to present unique issues of constitutional privacy. *E.g.*, *State v. Hinton*, 179 Wn.2d 862, 867-77, 319 P.3d 9 (2014) (reviewing an individual's privacy expectations in text messages under article I, section 7). Of particular concern is a phone's ability to operate as a "24-hour" surveillance tool, collecting and transmitting information about the location of the phone and its user. *See In re Order Authorizing Release of Historical Cell-Site Info.*, 809 F. Supp. 2d 113, 115 (E.D.N.Y. 2011) ("For many Americans, there is no time in the day when they are more than a few feet away from their cell phones.").

The United States Supreme Court recently summarized this cell phone location technology in *Carpenter v. United States*, __ U.S. __, 138 S. Ct. 2206, 201 L. Ed. 2d 507 (2018). The Court explained:

> Cell phones continuously scan their environment looking for the best signal, which generally comes from the closest cell site. Most modern devices, such as smartphones, tap into the wireless network several times a minute whenever their signal is on, even if the owner is not using one of the phone's features. Each time the phone connects to a cell site, it generates a time-stamped record known as cell-site location information (CSLI). The precision of this information depends on the size of the geographic area covered by the cell site. The greater the concentration of cell sites, the smaller the coverage area. . . . That has led to increasingly compact coverage areas, especially in urban areas.

7

> Wireless carriers collect and store CSLI for their own business purposes . . . . While carriers have long retained CSLI for the start and end of incoming calls, in recent years phone companies have also collected location information from the transmission of text messages and routine data connections. Accordingly, modern cell phones generate increasingly vast amounts of increasingly precise CSLI.

*Id.* at 2211-12.

Here, law enforcement contacted Muhammad's cell phone service provider to ping his phone, revealing real-time CSLI, which, as stated previously, is protected by the state and federal constitutions.

  i.  Washington State Constitution

Article I, section 7 provides that "[n]o person shall be disturbed in his [or her] private affairs, or his [or her] home invaded, without authority of law." It is well established that this provision is qualitatively different from the Fourth Amendment and provides greater protections. *State v. Mayfield*, 192 Wn.2d 871, 878, 434 P.3d 58 (2019) (citing *State v. Gunwall*, 106 Wn.2d 54, 720 P.2d 808 (1986)). Article I, section 7 "is grounded in a broad right to privacy" and protects citizens from governmental intrusion into their private affairs without the authority of law. *State v. Chacon Arreola*, 176 Wn.2d 284, 291, 290 P.3d 983 (2012).

Under article I, section 7, a search occurs when the government disturbs "those privacy interests which citizens of this state have held, and should be entitled to hold, safe from governmental trespass absent a warrant." *State v. Myrick*, 102 Wn.2d 506, 511, 688 P.2d 151 (1984). The "authority of law" required by article I, section 7 is a valid warrant, unless the State shows that a search or

seizure falls within one of the jealously guarded and carefully drawn exceptions to the warrant requirement. *State v. Miles*, 160 Wn.2d 236, 244, 156 P.3d 864 (2007); *State v. Rife*, 133 Wn.2d 140, 150-51, 943 P.2d 266 (1997).

To determine whether governmental conduct intrudes on a private affair, we look at the "nature and extent of the information which may be obtained as a result of the governmental conduct" and at the historical treatment of the interest asserted. *Miles*, 160 Wn.2d at 244.

This court's prior precedent demonstrates that CSLI is a "private affair." Two lines of cases support this outcome: (1) those concerning the method by which police obtain information, *e.g.*, *State v. Jackson*, 150 Wn.2d 251, 262, 76 P.3d 217 (2003) (stating that certain technology "does not merely augment [a law enforcement officer's] senses, but rather provides a *technological substitute for traditional visual tracking*" (emphasis added)); *State v. Young*, 123 Wn.2d 173, 182-84, 867 P.2d 593 (1994) (recognizing that police use of an infrared thermal device to detect heat distribution patterns within a home undetectable by human senses is particularly intrusive and exceeded article I, section 7 privacy protection), and (2) those recognizing the vast stores of personal details contained in electronic devices, *e.g.*, *Hinton*, 179 Wn.2d at 869-70 (holding text messages are "private affairs").

In the first line of cases, concerning the methods used by the police to obtain the information, we may look to *Jackson* and *Young* for guidance. 150 Wn.2d at 263; 123 Wn.2d at 183. In *Jackson*, we disagreed with the State that the use of a

GPS (global positioning system) device to track a suspected individual on his travels was tantamount to following him on public roads. *Id.* at 261. Generally, we noted, when law enforcement may detect something by using one or more of his or her senses, even if lightly augmented, the detection does not constitute a search. *State v. Seagull*, 95 Wn.2d 898, 901, 632 P.2d 44 (1981). It is lawful to use binoculars to better view a suspect or to brandish a flashlight to illuminate what could plainly be seen by day. But unlike binoculars or flashlights, a GPS device does more than merely "augment [an officer's] senses," it provides a "technological substitute for traditional visual tracking." *Jackson*, 150 Wn.2d at 262. In *Young*, we explained that infrared thermal imaging surveillance enabled law enforcement to "'see through the walls'" of a home and to go well beyond the enhancement of natural senses. 123 Wn.2d at 183. Such a device is a "particularly intrusive means of observation." *Id.*

Similar to the GPS device in *Jackson* and the thermal imaging surveillance in *Young*, a cell phone ping provides a "technological substitute for traditional visual tracking." *Jackson*, 150 Wn.2d at 262. When law enforcement loses sight of a suspected individual, officers need merely ask a cellular service carrier to ping that individual's phone and almost instantaneously police acquire data on the suspect's past and present location. This location tracking technique does substantially more than binoculars or flashlights; it enables officers to see farther than even the walls of a home—it pierces through space and time to pinpoint a cell phone's location and, with it, the phone's owner.

This is exactly what happened to Bisir Muhammad. The police could not locate Muhammad; they knew only that he had likely left the area after officers returned to his apartment complex and found the maroon sedan had disappeared. As Muhammad pointed out, the officers' senses alone could not locate him unless they "converted [his] phone" into a tracking device. Br. of Appellant at 24 (Wash. Ct. App. No. 34233-6-III (2017)).

Instructive in the second line of cases is *Hinton*, in which we held that viewing the contents of text messages exposes a "'wealth of detail about [a person's] familial, political, professional, religious, and sexual associations.'" 179 Wn.2d at 869 (alteration in original) (quoting *United States v. Jones*, 565 U.S. 400, 415, 132 S. Ct. 945, 181 L. Ed. 2d 911 (2012) (Sotomayor, J., concurring)). While pinging reveals only a cell phone owner's location, it is similar to text messages because it can reveal the same intimate details as phone calls, letters, and other forms of communication strongly protected under state law. *Id.* at 869-70; *see also State v. Roden*, 179 Wn.2d 893, 321 P.3d 1183 (2014) (holding that a text message conversation is a private affair).

Similarly, in *State v. Samalia*, we noted that a governmental search of a cell phone has the "potential to reveal a vast amount of personal information." 186 Wn.2d 262, 270, 375 P.3d 1082 (2016). We observed that many modern cell phones are in fact "'minicomputers that also happen to have the capacity to be used as a telephone. They could just as easily be called cameras, video players, rolodexes, calendars, tape recorders, [etc.].'" *Id.* at 271 (quoting *Riley v. California*,

573 U.S. 373, 393, 134 S. Ct. 2473, 189 L. Ed. 2d 430 (2014)). Easily added to this list is a "24-hour GPS tracking device."

Historical and real-time CSLI, like text messages, reveal an intensely intimate picture into our personal lives. Our cell phones accompany us on trips taken to places we would rather keep private, such as "'the psychiatrist, the plastic surgeon, the abortion clinic, the AIDS treatment center, the strip club, the criminal defense attorney, the by-the-hour motel, the union meeting, the mosque, synagogue or church, the gay bar and on and on.'" *Jones*, 565 U.S. at 415 (Sotomayor, J., concurring) (quoting *People v. Weaver*, 12 N.Y.3d 433, 441-42, 909 N.E.2d 1195, 882 N.Y.S.2d 357 (2009)). This type of information, revealed by our public movements, can expose personal details about family, politics, religion, and sexual associations. *See Hinton*, 179 Wn.2d at 869; *Samalia*, 186 Wn.2d at 270; *see also Miles*, 160 Wn.2d at 246 (holding that banking records are protected by article I, section 7 because they "may disclose what the citizen buys . . . [and] what political, recreational, and religious organizations a citizen supports").

The limited nature of the information provided by a one-time ping is not dispositive of whether cell phone location data is a private affair. Such an argument is essentially result driven and seizes solely on the extent of a privacy intrusion rather than the nature of the information at issue. Here, the cell phone ping placed Muhammad in an open field. Had the warrantless ping placed Muhammad not in a field fixing a fence but at a relative's home or found him

12

seeking solace in a house of worship, the limited information argument collapses. This one-time ping reveals only limited information, but the nature of the information has changed—exposing a cell phone user's attendance at a location a person would reasonably expect to be private. *Jones*, 565 U.S. at 414 (Sotomayor, J., concurring).

The ability of law enforcement to pinpoint any cell phone user's location at any moment would intrude on privacy in the same way as allowing police to listen in on an ongoing phone call or to peruse a text message conversation. Just because a given phone call may not contain private information does not mean that the phone call can be monitored by the police without a warrant. The same is true for a person's location identified via cell phone.

Our state constitution "'clearly recognizes an individual's right to privacy with no express limitations'." *Young*, 123 Wn.2d at 180 (quoting *State v. Simpson*, 95 Wn.2d 170, 178, 622 P.2d 1199 (1980) (plurality opinion)). Protecting the sensitive information gleaned from our location from unfettered state scrutiny "is essential for freedom of association and expression." *Hinton*, 179 Wn.2d at 877 (citing *Jones*, 565 U.S. at 416 (Sotomayor, J., concurring) ("Awareness that the government may be watching chills associational and expressive freedoms.")).

ii.     United States Constitution

Muhammad also argues that his cell phone location data is protected by the Fourth Amendment pursuant to the recent United States Supreme Court decision

13

in *Carpenter*. Although *Carpenter* expressly covers only historical, i.e., prior, CSLI, its reasoning applies to real-time CSLI.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. The United States Supreme Court has stated that

> "searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." The exceptions are "jealously and carefully drawn," and there must be "a showing by those who seek exemption . . . that the exigencies of the situation made that course imperative." "[T]he burden is on those seeking the exemption to show the need for it."

*Coolidge v. New Hampshire*, 403 U.S. 443, 454-55, 91 S. Ct. 2022, 29 L. Ed. 2d 564 (1971) (plurality opinion) (alterations in original) (footnotes omitted). Under the exclusionary rule, evidence obtained in violation of the Fourth Amendment is ordinarily excluded from the criminal trial of a defendant whose rights were violated by an illegal search or seizure. *Mapp v. Ohio*, 367 U.S. 643, 81 S. Ct. 1684, 6 L. Ed. 2d 1081 (1961) (extending exclusionary rule to state courts).

A Fourth Amendment search occurs when the government violates a subjective expectation of privacy that society recognizes as reasonable. *Kyllo v. United States*, 533 U.S. 27, 33, 121 S. Ct. 2038, 150 L. Ed. 2d 94 (2001); *Katz v. United States*, 389 U.S. 347, 361, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967) (Harlan, J., concurring) (establishing the two-pronged privacy test).

14

The Supreme Court has recently applied this in a context remarkably similar to the case before us. In *Carpenter*, the Court reviewed whether a warrantless cell phone ping and the resulting historical CSLI data violated the Fourth Amendment. Writing for the majority, Chief Justice John Roberts explained that allowing government access to CSLI "contravenes" society's expectation that law enforcement will not secretly monitor and catalog an individual's movements. 138 S. Ct. at 2217 (citing *Jones*, 565 U.S. at 430 (Alito, J., concurring in judgment)). The Court held that the data constitutes private information for the purposes of the Fourth Amendment. *Id.* at 2217-19. As such, acquiring an individual's historical CSLI requires a warrant based on probable cause. *Id.* at 2221. The Court cautioned, however, that its decision was narrow and did not express a view on matters not directly before it, namely the constitutionality of acquiring real-time CSLI without a warrant—such as the cell phone location data at issue here. *Id.* at 2220.

Nevertheless, *Carpenter*'s reasoning applies to real-time CSLI. Comparing historical CSLI to GPS monitoring, the *Carpenter* Court noted that "time-stamped data provides an intimate window into a person's life, revealing not only his [or her] particular movements, but through them . . . 'familial, political, professional, religious, and sexual associations.'" *Id.* at 2217 (quoting *Jones*, 565 U.S. at 415 (Sotomayor, J., concurring)). This data presents greater privacy concerns even

15

than GPS as it provides "near perfect surveillance" that is "remarkably easy, cheap, and efficient compared to traditional investigative tools." *Id.* at 2217-18.[3]

"[E]ven short-term monitoring" can generate a "comprehensive record of a person's public movements that reflects a wealth of detail about her familial, political, professional, religious, and sexual associations" that can be stored and mined for the future. *Jones*, 565 U.S. at 415 (Sotomayor, J., concurring). More concerning is the State's ability to utilize technology's substantial monitoring and tracking features at low cost, which may "'alter the relationship between citizen and government in a way that is inimical to democratic society.'" *Id.* at 416 (quoting *United States v. Cuevas-Perez*, 640 F.3d 272, 285 (7th Cir. 2011) (Flaum, J., concurring)).

Courts should take into account the substantial monitoring and tracking capabilities of technology in considering the existence of a reasonable expectation of privacy in public movement. *Jones*, 565 U.S. at 416 (Sotomayor, J., concurring). In so doing, "[a]ll of these concerns and conclusions about GPS tracking [as set out in *Jones*] also apply to tracking and monitoring by use of real time cell site

---

[3] A cell phone user's location data is not just collected by wireless service carriers. Technology companies compile information on users' whereabouts through "location history" services that gather data on devices even when applications are not open on a cell phone. Editorial, *Google Can See Where You've Been. So Can Law Enforcement*, WASH. POST, Apr. 15, 2019, https://www.washingtonpost.com/opinions/google-can-see-where-youve-been-so-can-law-enforcement/2019/04/15/90542fa6-5fbe-11e9-bfad-36a7eb36cb60_story.html [https://perma.cc/QS2A-EYMV]. Turning off multiple location tracking services built into our cell phones can be a complicated process, and disabling these services render many apps "less usable. Or in some cases, completely unusable." Barbara Krasnoff, *Android 101: How to Stop Location Tracking*, THE VERGE (Apr. 12, 2019 9:00 AM), https://www.theverge.com/2019/4/12/18302306/android-101-location-tracking-stop-how-to [https://perma.cc/B74Z-CNKK].

location information." *Tracey v. State*, 152 So. 3d 504, 519 (Fla. 2014). Accordingly, a cell phone user has a reasonable expectation of privacy in real-time CSLI, and the collection of location data implicates the Fourth Amendment. *Id.* at 516, 526; *see also In re Order Authorizing Disclosure of Location Info. of Specified Wireless Tel.*, 849 F. Supp. 2d 526, 539 (D. Md. 2011) (finding that a suspect "has a reasonable expectation of privacy . . . in his location as revealed by real-time location data").

Arguments against *Carpenter*'s application to real-time CSLI focus on the limited nature of the information provided CSLI and the third-party doctrine.[4] Neither argument is persuasive.

First, the argument that an isolated cell phone ping offers limited information and therefore does not implicate the Fourth Amendment appears to advance what federal courts have deemed the "mosaic" theory. Under this theory, discrete acts of law enforcement surveillance may be lawful in isolation but may otherwise intrude on reasonable expectations of privacy in the aggregate because they "'paint an "intimate picture" of a defendant's life.'" *Tracey*, 152 So. 3d at 520 (quoting *United States v. Wilford*, 961 F. Supp. 2d 740, 771 (D. Md. 2013)).

---

[4] The third-party doctrine "provides that if information is possessed or known by third parties, then, for purposes of the Fourth Amendment, an individual lacks a reasonable expectation of privacy in the information." Daniel J. Solove, *A Taxonomy of Privacy*, 154 U. PA. L. REV. 477, 526 (2006); *see also* Orin S. Kerr, *The Case for the Third-Party Doctrine*, 107 MICH. L. REV. 561, 563 (2009) ("By disclosing to a third party, the subject gives up all of his Fourth Amendment rights in the information revealed."). The United States Supreme Court has stated that "the Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by him to Government authorities, even if the information is revealed on the assumption that it will be used only for a limited purpose and the confidence placed in the third party will not be betrayed." *United States v. Miller*, 425 U.S. 435, 443, 96 S. Ct. 1619, 48 L. Ed. 2d 71 (1976).

At first glance, the mosaic theory presents an attractive answer to whether a singular cell phone ping constitutes a Fourth Amendment search. But federal courts have recognized the practical problems inherent in this theory when traditional surveillance becomes a search only after some specific period of time elapses. *Wilford*, 961 F. Supp. 2d at 772 (citing *United States v. Graham*, 846 F. Supp. 2d 384, 401-03 (D. Md. 2012)). As *Graham* noted, "discrete acts of law enforcement are either constitutional or they are not." 846 F. Supp. 2d at 401. For instance, to conclude that one cell phone ping is not a search, provided it lasts less than six hours, yet hold multiple or longer pings *do* qualify as search is not a workable analysis. *See Commonwealth v. Estabrook*, 472 Mass. 852, 858, 38 N.E.3d 231 (2015) (concluding no warrant is required to obtain historical CSLI relating to a period of six hours or less). There is no rational point to draw the line; it is arbitrary and unrelated to a reasonable expectation of privacy.

Rather than offering analysis based on a reasonable expectation of privacy, the mosaic theory instead requires a case-by-case, ad hoc determination of whether the length of time of a cell phone ping violated the Fourth Amendment. It offers little guidance to courts or law enforcement and presents the "danger that constitutional rights will be arbitrarily and inequitably enforced." *Oliver v. United States*, 466 U.S. 170, 181-82, 104 S. Ct. 1735, 80 L. Ed. 2d 214 (1984). "'[I]f police are to have workable rules, the balancing of the competing interests . . . must in large part be done on a categorical basis—not in an ad hoc, case-by-case fashion

18

by individual police officers.'" *Tracey*, 152 So. 3d at 521 (alterations in original) (internal quotation marks omitted) (quoting *Riley*, 573 U.S. at 398).

Second, the third-party doctrine does not permit a warrantless search of CSLI after the Court's opinion in *Carpenter*. Before *Carpenter*, some federal courts had concluded there was no reasonable expectation of privacy in cell phone location data in possession of third-party service providers. *E.g.*, *United States v. Graham*, 824 F.3d 421, 427 (4th Cir. 2016). The *Carpenter* Court explained that the third-party doctrine has failed to keep pace with the "seismic shifts in digital technology." 138 S. Ct. at 2219. An individual may have a "diminished" privacy interest in location data revealed to third parties, but that alone does not mean "'the Fourth Amendment falls out of the picture entirely.'" *Id.* (quoting *Riley*, 573 U.S. at 392).

Moreover, voluntary exposure of CSLI "is not truly 'shared'" as the term is normally understood. *Id.* at 2220. Cell phones log cell site records "without any affirmative act on the part of the user beyond powering up. Virtually any activity on the phone generates CSLI." *Id.* Apart from turning off a cell phone, "there is no way to avoid leaving behind a trail of location data." *Id.*[5] *Carpenter* therefore

---

[5] Justice Madsen's opinion wishes to ease our fears regarding the government's use of CSLI data by noting that this data is not as precise as GPS tracking data. Concurrence/dissent (Madsen, J.) at 4. But even the slightly lesser precision of CSLI compared to GPS nevertheless augments a police officer's senses and provides a "technological substitute for traditional visual tracking." *Jackson*, 150 Wn.2d at 262. Such technology is particularly intrusive and exceeds article I, section 7. *Young*, 123 Wn.2d at 182-84. To the extent Justice Madsen's opinion echoes concerns raised in *Carpenter* that CSLI data places a cell phone user within a generalized location area from which police must triangulate and infer a user's location, we agree with the federal Supreme Court that inference does not insulate a search. *Carpenter*, 138 S. Ct. at 2218 (quoting *Kyllo*, 533 U.S. at 36).

declined to extend third-party doctrine to the collection of CSLI. *Id.* Thus, the third-party rationale no longer controls cases concerning historical CSLI data, and its persuasive authority is significantly undercut regarding real-time CSLI data because, as *Carpenter* stated, individuals maintain an expectation of privacy in the record of their physical movements obtained from CSLI data. 138 S. Ct. at 2217.

Overall, similar to our discussion of the Washington State Constitution,[6] Fourth Amendment case law indicates that individuals have a subjective expectation of privacy in the location data transmitted by their cell phone. *Riley*, 573 U.S. at 385 (cell phones are "a pervasive and insistent part of daily life"). This is an expectation that society recognizes as reasonable. *See Katz*, 389 U.S. at 361 (Harlan, J., concurring).[7] For these reasons, seven members of the court agree that the ping is a search under both article I, section 7 and the Fourth Amendment. *See* lead opinion of Wiggins, J.; opinion of Gordon McCloud, J.

---

[6] Justice Madsen's opinion asserts that our reliance on *Jackson*, *Young*, and *Hinton* is misplaced because of the third-party doctrine. *See* concurrence/dissent (Madsen, J.) at 4 (unlike historical CSLI, "what is at stake [here] is freely transmitted data that a person voluntarily gives in exchange for" cell phone use). But Washington has never ascribed to the third-party doctrine. *Gunwall*, 106 Wn.2d at 63-64 (rejecting the third-party doctrine applied by federal courts to telephone pen registers); *see also Hinton*, 179 Wn.2d at 875 (stating article I, section 7 does not "require individuals to veil their affairs in secrecy and avoid sharing information in ways that have become an ordinary part of life"). Moreover, cell phone users have very little control over the choice to "freely" transmit cell phone location data to service providers. *See* concurrence/dissent (Madsen, J.) at 4. As the Supreme Court expressly noted in *Carpenter*, cell phone location data is not truly "shared" because a user's phone records and transmits this data to service providers by virtue of its operation. 138 S. Ct. at 2220. Consequently, "in no meaningful sense does the user voluntarily 'assume[ ] the risk' of turning over" CSLI data. *Id.* (alteration in original).

[7] Justice Madsen's opinion generally discusses its reasoning in terms of an individual's "reasonable expectation of privacy in real-time CSLI" data. Concurrence/dissent (Madsen, J.). But this court's article I, section 7 jurisprudence does not discuss privacy in terms of reasonableness.

B. Exigent circumstances exist to justify the warrantless cell phone search

Because the State failed to procure a warrant prior to pinging Muhammad's cell phone, the evidence obtained pursuant to the improper search is subject to suppression unless the State proves that an exception to the warrant requirement applies. *State v. Hendrickson*, 129 Wn.2d 61, 71, 917 P.2d 563 (1996); *Carpenter*, 138 S. Ct. at 2222-23 (noting that when exigent circumstances arise, the needs of law enforcement may be so compelling that the warrantless collection of CSLI is justified).

We begin with the presumption that warrantless searches are per se unreasonable under our state constitution. *Hendrickson*, 129 Wn.2d at 70. Even where probable cause to search exists, a warrant must be obtained unless excused under one of a narrow set of exceptions to the warrant requirement. *Id.* We have recognized exceptions for, among other things, exigent circumstances. *Id.* at 71. The State bears the burden to show an exception applies. *Id.*

The warrant requirements must yield when exigent circumstances demand that police act immediately. *State v. Cuevas Cardenas*, 146 Wn.2d 400, 405, 47 P.3d 127, 57 P.3d 1156 (2002). Exigency exists when obtaining a warrant is impractical because delay inherent in securing a warrant would compromise officer safety, facilitate escape, or permit destruction of evidence. *State v. Smith*, 165 Wn.2d 511, 517, 199 P.3d 386 (2009).

We have identified five circumstances that could be termed exigent: hot pursuit, fleeing suspect, danger to arresting officer or the public, mobility of a

vehicle to be searched, and mobility or destruction of evidence. *State v. Tibbles*, 169 Wn.2d 364, 370, 236 P.3d 885 (2010). The presence of one or more of these factors does not necessarily establish exigent circumstances, and a court looks to the totality of the circumstances. *Id.*; *Smith*, 165 Wn.2d at 518.

Six factors further guide our analysis of whether exigent circumstances exist: (1) the gravity or violent nature of the offense with which the suspect is to be charged, (2) whether the suspect is reasonably believed to be armed, (3) whether there is reasonably trustworthy information that the suspect is guilty, (4) a strong reason to believe the suspect is on the premises, (5) a likelihood that the suspect will escape if not quickly apprehended, and (6) entry is made peaceably. *Cardenas*, 146 Wn.2d at 406. Every factor need not be present, but they must show that officers needed to act quickly. *Id.*

To prove exigent circumstances, the State must "'point to specific, articulable facts and the reasonable inferences therefrom which justify the intrusion.'" *State v. Coyle*, 95 Wn.2d 1, 9, 621 P.2d 1256 (1980) (quoting *State v. Diana*, 24 Wn. App. 908, 911, 604 P.2d 1312 (1979)).[8] The mere suspicion of flight or destruction of evidence does not satisfy this particularity requirement. *Id.*

---

[8] Justice Gordon McCloud's opinion notes that to prove exigency, the State must point to articulable facts and reasonable inferences drawn therefrom. Opinion of Gordon McCloud, J., at 26. To do so, Justice Gordon McCloud asserts that the State must "show either that the police had 'specific prior information' that the suspect had planned to flee or destroy evidence, or that the police were 'confronted with some sort of contemporaneous sound or activity alerting them to the possible presence of an exigent circumstance.'" *Id.* at 25 (internal quotation marks omitted) (quoting *Coyle*, 95 Wn.2d at 10). Because the police had no "prior information that Muhammad planned to destroy evidence or flee," nor "were they confronted with any contemporaneous activity alerting them that Muhammad was carrying out plans to destroy evidence or flee," *id.* at 26-27,

22

Under the facts of this case, the State has proved exigent circumstances—specifically that Muhammad was in flight, that he might have been in the process of destroying evidence, that the evidence sought was in a mobile vehicle, and that the suspected crimes (murder and rape) were grave and violent charges. *Tibbles*, 169 Wn.2d at 370-71.

Muhammad contends that the State fails to prove exigency for three reasons. First, the facts do not indicate any need for police to act quickly: if Muhammad actually intended to flee, he would have done so immediately and not lingered in the area for three days. Second, police created the exigency by alerting him to their interest in his car. Third, the particularity requirement is not satisfied because police merely suspected Muhammad fled his apartment. An officer had earlier observed Muhammad leave his home, travel to a local store, and return. Considering this behavior, the reasonable inference was not that Muhammad absconded but, rather, that he had gone to the local shops.

These arguments do not show that the police's reasonable inferences were mistaken. First, it does not follow that the individual who killed Richardson would necessarily and immediately leave the area. Until alerted otherwise, a perpetrator may believe he or she successfully committed a crime and may feel no pressure

---

exigency did not exist. But *Coyle* concerns the "knock and announce" rule: the police must knock, announce their presence, and wait prior to entering a home. *Coyle*'s considerations about prior information that a suspect had planned to flee or police confronted with a contemporaneous sound are inappropriate here. That is not to say we disagree that the State must still show articulable facts and reasonable inferences drawn therefrom—indeed, this is still the requirement. However, considerations applicable to knock and announce are not appropriate in the context of this case.

to escape police scrutiny. Here, Muhammad learned of the police's interest in his car *after* the November 10, 2014 traffic stop. Muhammad left the area when police focused their investigation on a vehicle like his. That this knowledge was a point of interest for the police also supports the concern that Muhammad might destroy any evidence contained in the sedan.

Nor did law enforcement purposely create exigent circumstances. Nothing in the record indicates police purposely asked Muhammad about his car to manufacture urgency. An officer noticed the sedan's distinctive features from the security camera footage and stopped Muhammad to inquire further. In fact, officers later obtained a search warrant for the car partially based on evidence collected from the traffic stop. Little incentive existed for officers to encourage Muhammad to flee and frustrate execution of that warrant.

Finally, it was reasonable to conclude Muhammad had fled. Muhammad's claim that his prior behavior indicated that he merely went shopping must be evaluated against the critical fact that Muhammad's vehicle disappeared *only after* police discontinued surveillance. Thus, officers reasonably inferred that Muhammad knew he was a suspect and had fled the area. As the preceding factors demonstrate, circumstances were exigent. Law enforcement reasonably believed that they needed to act quickly to apprehend Muhammad and prevent destruction of evidence contained in a mobile vehicle. *Smith*, 165 Wn.2d at 517. The State provided articulable facts and reasonable inferences drawn therefrom supporting these concerns. Six members of the court therefore agree that the

ping was permissible. *See* lead opinion of Wiggins, J. (exigency); concurrence/dissent (Madsen, J.) (ping not a search and therefore no exception to the warrant requirement necessary).

2.     Five members of the court hold that convictions for rape and felony murder predicated on rape violate double jeopardy

Muhammad contends that his convictions for first degree rape and felony murder constitute the same criminal conduct under double jeopardy and should have merged. Justices Madsen and Gordon McCloud agree, holding that these convictions violated double jeopardy. This holding of our court reverses the Court of Appeals and remands the case to the trial court for the dismissal of the lesser-included offense.

We, however, disagree. Double jeopardy is ultimately a matter of legislative intent. Here, because the legislature indicated its intent to punish both felony murder and rape separately, we would hold that the convictions do not violate double jeopardy.

Double jeopardy presents questions of law that are reviewed de novo. *State v. Hughes*, 166 Wn.2d 675, 681, 212 P.3d 558 (2009). The double jeopardy clauses of the state and federal constitutions protect a defendant from multiple prosecutions and multiple punishments for the same offense. *Whalen v. United States*, 445 U.S. 684, 688, 100 S. Ct. 1432, 63 L. Ed. 2d 715 (1980); *State v. Vladovic*, 99 Wn.2d 413, 423, 662 P.2d 853 (1983). "Where a defendant's act supports charges under two criminal statutes, a court weighing a double jeopardy

25

challenge must determine whether, in light of legislative intent, the charged crimes constitute the same offense." *In re Pers. Restraint of Orange*, 152 Wn.2d 795, 815, 100 P.3d 291 (2004). Crimes constitute the same criminal conduct when they "require the same criminal intent, are committed at the same time and place, and involve the same victim." RCW 9.94A.589(1)(a). Unless all elements are present, the offenses must be counted separately. *State v. Porter*, 133 Wn.2d 177, 181, 942 P.2d 974 (1997). The legislature has the power to define offenses and set punishments. *See State v. Calle*, 125 Wn.2d 769, 777-78, 888 P.2d 155 (1995) (holding that rape and incest are separate offenses).

Federal double jeopardy is largely guided by the *Blockburger* test. *Blockburger v. United States*, 284 U.S. 299, 304, 52 S. Ct. 180, 76 L. Ed. 306 (1932). The Court employed this test as a tool of statutory interpretation, which provides:

> The applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not.

*Id.* Washington's "same evidence" test is similar: "'where the same act . . . constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact that the other does not.'" *Calle*, 125 Wn.2d at 777-78 (quoting *Blockburger*, 284 U.S. at 304).

If one of two charged crimes requires proof of a fact not required by the other, the crimes will not constitute the same offense and cumulative punishment is presumptively allowed. *See Missouri v. Hunter*, 459 U.S. 359, 367, 103 S. Ct. 673, 74 L. Ed. 2d 535 (1983). If the charged crimes fail this test, then the charged crimes constitute one offense and cumulative punishment is presumptively precluded. *See Whalen*, 445 U.S. at 691-92. However, the presumption against separate punishments is rebuttable. We do not mechanically apply double jeopardy principles; nor do we consider them in a vacuum. *State v. Brown*, 64 Wn. App. 606, 615, 825 P.2d 350 (1992); *see State v. Gocken*, 127 Wn.2d 95, 113, 121, 896 P.2d 1267 (1995) (Johnson, J., dissenting) (cautioning against reliance "on a rigid and mechanical examination of the elements" of charged offenses). Thus *Blockburger* "is not dispositive of the question whether two offenses are the same. . . . [I]t is not controlling where there is clear evidence of contrary legislative intent." *In re Pers. Restraint of Percer*, 150 Wn.2d 41, 50-51, 75 P.3d 488 (2003). Where the legislature specifically authorizes cumulative punishment under two statutes, regardless of whether they proscribe the same conduct under *Blockburger*, a court's task of statutory construction is at an end, and the trial court may impose cumulative punishments under such statutes in a single trial. *Hunter*, 459 U.S. at 368-69.

We review double jeopardy in the following manner. We begin with the language of the statutes themselves to determine whether the legislature intended to authorize multiple punishments for violations of the rape and murder

27

statutes. *See Calle*, 125 Wn.2d at 776 (citing *Albernaz v. United States*, 450 U.S. 333, 336, 101 S. Ct. 1137, 67 L. Ed. 2d 275 (1981)).

Next, if the legislative intent is not clear from the statutory text, we may turn to statutory construction and the "same evidence" test. *Calle*, 125 Wn.2d at 777-78; *Blockburger*, 284 U.S. at 304. Under the same evidence test, a defendant's double jeopardy rights are violated if he or she is convicted of offenses that are identical both in fact and in law. *Calle*, 125 Wn.2d at 777. If each crime contains an element that the other does not, we presume that the crimes are not the same offense. *Id.* The *Blockburger* test and the same evidence test are rules of statutory construction, and both serve as a means of discerning legislative purpose. They should not be controlling where there is a clear indication of contrary legislative intent. *See Calle*, 125 Wn.2d at 778 (citing *Albernaz*, 450 U.S. at 340).

Finally, if applicable, we consider the merger doctrine to determine legislative intent, even when two crimes have formally different elements. Under the merger doctrine, when the degree of one offense is raised by conduct separately criminalized by the legislature, we presume the legislature intended to punish both offenses through a greater sentence for the greater crime. *Vladovic*, 99 Wn.2d at 419.

However, even if two convictions appear to be for the same offense or for charges that would merge, an exception may apply. Two convictions may be punished separately if the defendant's conduct forming one crime demonstrates an independent purpose or effect from the second crime. *State v. Kier*, 164 Wn.2d

798, 804, 194 P.3d 212 (2008) (citing *State v. Freeman*, 153 Wn.2d 765, 773, 108 P.3d 753 (2005); *State v. Johnson*, 92 Wn.2d 671, 680, 600 P.2d 1249 (1979)); *State v. Harris*, 167 Wn. App. 340, 355, 272 P.3d 299 (2012) (citing *Vladovic*, 99 Wn.2d at 421); *In re Pers. Restraint of Francis*, 170 Wn.2d 517, 533-34, 242 P.3d 866 (2010) (Madsen, C.J., concurring).

Turning to the case at hand, we look first to the statutory language to determine the legislative intent underlying the rape and felony murder provisions. *Freeman*, 153 Wn.2d at 773; *Calle*, 125 Wn.2d at 776. Evidence of legislative intent may be clear on the face of the statute or found in the legislative history, the structure of the statutes, the fact the two statutes are directed at eliminating different evils, or any other source of legislative intent. *Freeman*, 153 Wn.2d at 773 (citing *Ball v. United States*, 470 U.S. 856, 864, 105 S. Ct. 1668, 84 L. Ed. 2d 740 (1985)).

The felony murder provision, RCW 9A.32.030, states in relevant part,

(1) A person is guilty of murder in the first degree when:

. . . .

(c) He or she commits or attempts to commit the crime of . . . (2) rape in the first or second degree . . . and in the course of or in furtherance of such crime or in immediate flight therefrom, he or she, or another participant, causes the death of a person other than one of the participants.

RCW 9A.44.040 states that a person is guilty of first degree rape "when such person engages in sexual intercourse with another person by forcible compulsion."

29

Neither statute addresses explicitly the issue of whether multiple convictions for the act of intercourse and murder have been authorized.

We next examine the statutes under *Blockburger* and the same evidence test. As previously stated, double jeopardy is violated if a defendant is convicted of offenses that are identical in both fact and law. *Calle*, 125 Wn.2d at 777. If each offense, as charged, includes elements not included in the other, the offenses are different and multiple convictions can stand. *Id.*

Here, the State charged Muhammad with first degree rape and felony murder. To convict Muhammad of rape, the State had to prove that he "engaged in sexual intercourse" with Richardson "by forcible compulsion" and that he kidnapped or inflicted serious physical injury on her. Clerk's Papers (CP) at 384 (jury instruction 15); RCW 9A.44.040. To convict on felony murder, the State had to prove that Muhammad committed or attempted to commit rape in the first or second degree and that he killed Richardson in the course of or furtherance of the rape, or in immediate flight from that crime. CP at 383 (jury instruction 14); RCW 9A.32.030.

Muhammad contends that the felony murder statute incorporates all the elements of the first degree rape statute and that the State proved facts sufficient to convict Muhammad on that charge. Simply put, the State charged and factually proved first degree rape, and it was sufficient factually to prove first degree felony murder. Therefore, the offenses are the same under *Blockburger*. *Calle*, 125 Wn.2d at 777; *Harris v. Oklahoma*, 433 U.S. 682, 682-83, 97 S. Ct. 2912, 53 L.

Ed. 2d 1054 (1977) (per curiam decision stating that where felony murder required conviction of lesser crime, double jeopardy barred second trial on lesser crime after conviction on the greater crime).

But *Blockburger* is not the beginning and end of our double jeopardy analysis. *See Calle*, 125 Wn.2d at 780.

The fundamental issue is whether the legislature intended to authorize multiple punishments for criminal conduct that violates more than one statute. *Calle*, 125 Wn.2d at 776. Here, we may return to other evidence of legislative intent, "'including the statutes' historical development, legislative history, location in the criminal code, or the differing purposes for which they were enacted.'" *Freeman*, 153 Wn.2d at 777 (quoting *Percer*, 150 Wn.2d at 51). The process is recursive, returning to the legislature's intent again and again. *Id.*

We find this evidence by examining the legislative history of the rape and felony murder statutes. First, rape and felony murder are located in different sections of the criminal code. *Compare* RCW 9A.44.040 (first degree rape), *with* RCW 9A.32.030 (murder in the first degree). While felony murder does incorporate first degree rape, it is not defined in that provision. The crime and degrees of rape are established in chapter 9A.32 RCW. Muhammad is correct that the statutory location of offenses in different sections of the criminal code is not by itself conclusive evidence of legislative intent. But when considered with other indicia

of legislative intent described below, this information is persuasive. *See Calle*, 125

Wn.2d at 780.[9]

Second, provisions criminalizing rape and homicide serve discrete goals.

Chapter 9A.36 RCW, which criminalizes homicide, serves the public purpose of

protecting human life. *Danny v. Laidlaw Transit Servs., Inc.*, 165 Wn.2d 200, 218-

19, 193 P.3d 128 (2008) (plurality opinion) (citing *Gardner v. Loomis Armored, Inc.*,

128 Wn.2d 931, 944, 913 P.2d 377 (1996) ("Society places the highest priority on

the protection of human life.")). The legislature's intent underlying the felony

murder statutes is to punish those who commit a homicide in the course of a felony

under the applicable murder statute. *State v. Gamble*, 154 Wn.2d 457, 468, 114

P.3d 646 (2005).

The criminalization of rape serves a different, independent goal. Rape has

been a statutory offense in Washington since before statehood. *See Calle*, 125

---

[9] Justice Gordon McCloud's opinion asserts that *Calle* is distinguishable from the current case because the *Calle* court held the statutes at issue were not the same under *Blockburger*. Opinion of Gordon McCloud, J., at 14-15. That opinion is correct on this point; however, as *Calle* demonstrates, a reviewing court's principal concern in double jeopardy is to discover legislative intent. Therefore, as in *Calle*, we continue our analysis despite the outcome of the *Blockburger* test. *See* 125 Wn.2d at 778-81. Justice Gordon McCloud argues *Calle* is further distinguished from this case because the felony murder statute, RCW 9A.32.030, "explicitly cross-references" rape in the first or second degree and so unlike the rape and incest statutes in *Calle*, felony murder and rape are not "truly located somewhere else" in the criminal code. Opinion of Gordon McCloud, J., at 14. Cross-referencing statutes are of two types: specific or general. 2B NORMAN J. SINGER, SUTHERLAND STATUTES AND STATUTORY CONSTRUCTION § 51:07 (6th ed. 2000). Specific cross-references refer to the particular statute by its title or section number, while a general reference refers to the law on the subject generally. *Id*. A general reference is, for example, contracts made under the statute are to be made "in the manner now provided by law." *Id*. RCW 9A.32.030's reference to "rape" is not a specific reference, nor does it appear to be a general cross-reference as the statute merely refers to first degree rape. *Cf. State v. Weatherwax*, 188 Wn.2d 139, 149, 392 P.3d 1054 (2017) (noting cross-referencing statutory provisions that use specific chapter and title); *see also State v. Eckblad*, 152 Wn.2d 515, 519, 98 P.3d 1184 (2004) (regarding RCW 46.61.688's cross-reference to the federal motor vehicle safety standard 208). Mentioning rape is not sufficient evidence that felony murder "explicitly cross-references" RCW 9A.44.040.

Wn.2d at 780; CODE OF 1881 § 812; *see also* LAWS OF 1909, ch. 249, § 183 (defining "rape" as an act of sexual intercourse with a female who is not the perpetrator's wife and without her consent). Chapter 9A.44 RCW prohibits acts of unlawful sexual intercourse. *Calle*, 125 Wn.2d at 780. The focus of rape is "not simply sexual violation, but also the fear, degradation and physical injury accompanying that act." *Id.* at 781 (quoting Helen G. Tutt, Comment, *Washington's Attempt To View Sexual Assault as More Than a "Violation" of the Moral Woman—The Revision of the Rape Laws*, 11 GONZ. L. REV. 145, 155 (1975)). Rape and homicide are "'directed to separate evils'" and therefore constitute separate offenses. *Id.* at 781 (quoting *Albernaz*, 450 U.S. at 343). In other words, the legislature meant to allow multiple punishments for felony murder and the predicate offense of rape because the statutes seek to prevent separate harms.

Based in part on these factors, other states have resolved whether their legislatures intended to punish a defendant for both felony murder and the underlying felony. "Of these courts, the great majority uphold separate punishment for felony murder and the underlying felony." *Todd v. State*, 884 P.2d 668, 678-79 (Alaska Ct. App. 1994), *aff'd*, 917 P.2d 674 (Alaska 1996); *see, e.g., State v. Blackburn*, 694 S.W.2d 934, 936-37 (Tenn. 1985) (holding a defendant can be punished for assault with intent to commit rape and resulting felony murder); *Fitzgerald v. Commonwealth*, 223 Va. 615, 634-35, 292 S.E.2d 798 (1982) (concluding legislature permitted conviction for robbery, rape, and resulting felony murder); *State v. Greco*, 216 Conn. 282, 579 A.2d 84 (1990) (same); *Todd*, 884

P.2d at 680 (citing additional cases in support); *cf. Cook v. State*, 841 P.2d 1345 (Wyo. 1992) (holding legislature intended felony murder to be the most aggravated form of robbery, thus, only one punishment for felony murder and underlying felony); *Harris*, 433 U.S. at 682 ("When, as here, conviction of a greater crime, murder, cannot be had without conviction of the lesser crime, robbery with firearms, the Double Jeopardy Clause bars prosecution for the lesser crime, after conviction of the greater one."); *Whalen*, 445 U.S. at 691-92 (holding that felony murder and rape are the same offense).[10]

Similar to the rape and incest charges in *Calle*, the legislature intended to punish felony murder and rape separately, acknowledging the "widespread public perception that serious crimes, such as robbery, rape, and burglary, that result in death, are not simply a more serious version of the underlying felony. Rather it is a different crime altogether." *In re Pers. Restraint of Bowman*, 162 Wn.2d 325, 333-34, 172 P.3d 681 (2007) (citing David Crump & Susan Waite Crump, *In*

---

[10] We are not compelled to the same results set out in *Harris* or *Whalen*. The Supreme Court describes its opinion in *Harris* as a "terse per curiam," *United States v. Dixon*, 509 U.S. 688, 698, 113 S. Ct. 2849, 125 L. Ed. 2d 556 (1993), that did not mention *Blockburger* and precluded a subsequent prosecution for robbery with a firearm after the defendant had already been convicted of felony murder based on that robbery. The current case does not concern subsequent prosecutions. In *Whalen*, the Court held that convicting and sentencing a defendant to both felony murder and the predicate felony of rape violated the "multiple punishments" strand of double jeopardy because proof of rape is a necessary element of proof of the felony murder. 445 U.S. at 688, 694. But *Whalen* is distinguishable. First, that opinion reviews the laws of the District of Columbia, a federal enclave. Thus, its laws are inherently federal. *See also State v. Garza*, 2014 SD 67, ¶ 16, 854 N.W.2d 833, 839-40 (explaining that *Whalen* does not bind state courts' interpretations of state statutes). Thus, the Court's application of *Blockburger* to determine the statutory construction dealt not with state but federal law. *Id.* And as *Hunter* noted and we have repeatedly affirmed, questions of state legislative intent are left to state courts. 459 U.S. at 368; *e.g., Freeman*, 153 Wn.2d at 771; *Calle*, 125 Wn.2d at 778. We are not bound to interpret our state statutes as the *Whalen* Court interpreted federal law.

*Defense of the Felony Murder Doctrine*, 8 HARV. J.L. & PUB. POL'Y 359, 396 (1985)).[11] Based on the above considerations, the legislature has expressed its intent to punish felony murder and rape as separate offenses.[12]

Furthermore, even if these convictions appear to merge, the independent purposes exception to the merger doctrine applies. *Vladovic*, 99 Wn.2d at 421 (quoting and citing *Johnson*, 92 Wn.2d at 680). To establish an independent purpose or effect, there must be a showing that the element crime caused "some injury to the person or property of the victim or others, which is separate and distinct from and not merely incidental to the crime of which it forms an element." *Johnson*, 92 Wn.2d at 680; *Harris*, 167 Wn. App. at 355; *State v. Saunders*, 120 Wn. App. 800, 807-08, 821, 86 P.3d 232 (2004) (holding convictions for felony murder and first degree rape did not merge when murder was distinct from and not incidental to the rape).

*Saunders* is particularly instructive. In *Saunders*, defendants Williams and Saunders restrained the victim, attempted to force her to perform oral sex, anally

---

[11] Justice Gordon McCloud's opinion discusses the antimerger statute for burglary, stating that lawmakers did not authorize separate punishments for felony murder or rape as they did for offenses occurring in the course of a burglary, the implication being that because lawmakers enacted an antimerger statute for burglary and did not for rape and felony murder, the legislature *intended* for those crimes to merge. Opinion of Gordon McCloud, J., at 9-10. But this is not how we construe statutes or decipher legislative intent. That the legislature expressly authorized multiple punishments for a different crime altogether says nothing about the specific crimes at issue here. Without some indication lawmakers were aware felony murder and rape can and should merge, which somehow surfaced in the course of enacting the burglary antimerger statute, the provision is irrelevant.

[12] This intent is not unclear; thus the rule of lenity does not apply. *State v. Jackman*, 156 Wn.2d 736, 751, 132 P.3d 136 (2006) ("[U]nder the rule of lenity, convictions under both statutes violate double jeopardy *if the legislature's intent is unclear*." (emphasis added)).

raped her, and then stabbed and asphyxiated her, causing her death. 120 Wn. App. at 807-08. A jury convicted Saunders of felony murder, first degree robbery, first degree kidnapping, and first degree rape. *Id.* at 808. On appeal, Saunders argued in part that the first degree rape and felony murder convictions merged. *Id.* at 820. The court reviewed whether an exception to merger applied when the predicate and charged crimes are not "intertwined." *Id.* at 821-22 (citing *Johnson*, 92 Wn.2d at 681). The *Saunders* court then reviewed three factors it deemed central to *Johnson*: time and location of the charged crimes (rape and kidnapping occurred "almost contemporaneously in time and place"), the sole purpose of one crime was to further the other, and that no independent and greater injury occurred. *Id.* at 822 (quoting *Johnson*, 92 Wn.2d at 681). Whether merger applies is reviewed on a case-by-case basis. *Id.* at 821.

Applying these three factors, we would conclude that the rape and murder were separate injuries and that the independent purposes and effects exception to the merger doctrine applies.[13] First, the record indicates that Richardson got a ride

---

[13] Justice Gordon McCloud points to *Francis* for support for its assertion that felony murder must merge with the underlying felony. Opinion of Gordon McCloud, J., at 11 (quoting 170 Wn.2d at 527). That opinion correctly restates that if the defendant in *Francis* had pleaded guilty to the attempted robbery of one victim and felony murder of that same victim, double jeopardy would preclude conviction on the attempted murder count. *Id.* The decision went on to explain that this would be the outcome because the felony murder "'had no purpose or intent outside of accomplishing the robbery.'" *Francis*, 170 Wn.2d at 527 (quoting *State v. Williams*, 131 Wn. App. 488, 499, 128 P.3d 98 (2006)). In other words, the exception to the merger doctrine did not apply in *Francis*. Justice Gordon McCloud's opinion focuses exclusively on the independent *purposes* aspect and ignores the independent *effects* resulting from the commission of rape and felony murder. *See* opinion of Gordon McCloud, J., at 12, 16-17. Here, the rape resulted in independent and severe injuries from the murder. Muhammad manually strangled Richardson after raping her. Evidence was presented at trial that the rape and vaginal penetration caused internal bleeding,

from Muhammad and over the course of a few hours, she was raped and murdered. This does not support that the rape and murder occurred contemporaneously.[14] Second, even assuming the offenses occurred close in time, nothing in the record indicates that Muhammad raped Richardson in order to strangle her. *Cf. Saunders*, 120 Wn. App. at 822 ("'the sole purpose of the kidna[p]ping . . . and assault was to compel the victims' submission to acts of sexual intercourse'" (internal quotation marks omitted) (quoting *Johnson*, 92 Wn.2d at 681)). As to the third factor, the record provides that Richardson suffered injuries separate and distinct from the murder. *Id.* at 824. The rape caused a laceration in Richardson's vaginal canal. Strangulation caused her death and resulted in injuries to her neck and eyes. These are separate and distinct injuries.

Muhammad urges us not to follow *Saunders*. He asserts that its application would "create a categorical exception" for a rape serving as a predicate for felony murder. Suppl. Br. of Pet'r at 23. Rape, Muhammad claims, is rarely fatal and will typically create a separate injury to killing. However, nothing in the above analysis requires creation of a "categorical exception" for rape and felony murder. The

---

which could not have occurred after strangulation as it was an "antemortem" injury. *See* 2 Verbatim Tr. of Proceedings (VTP) at 326-27; 3 VTP at 485.

[14] Muhammad contends the merger exception articulated by *Freeman* does not apply when, as here, the "defendant simply used more force than necessary to effectuate the crime." Suppl. Br. of Pet'r at 19 (citing 153 Wn.2d at 779). He argues that first degree rape required proof of forcible compulsion and that the force used "was greater than necessary to achieve the rape" and thus does not support the conclusion that the crimes may be separately punished. *Id.* at 20. This argument is unconvincing. Where a defendant struck a victim after completing a robbery, there was a separate injury and intent, justifying a separate assault conviction. *State v. Prater*, 30 Wn. App. 512, 516, 635 P.2d 1104 (1981). Similarly, Muhammad strangled Richardson after raping her, causing "antemortem" injuries, such as internal bleeding. *See* 2 VTP at 326-27; 3 VTP at 485.

analysis. The *Saunders* factors must be analyzed together, as part of a heavily fact-dependent analysis. A different factual scenario may lead to merger. *E.g.*, *Johnson*, 92 Wn.2d at 676; *see State v. Fagundes*, 26 Wn. App. 477, 485, 614 P.2d 198 (1980) (quoting *Johnson*, 92 Wn.2d at 676); *cf. State v. Peyton*, 29 Wn. App. 701, 720, 630 P.2d 1362 (1981) (declining to follow *Fagundes* when underlying felony was "separate and distinct" from "felony-murder").

The statutory language and legislative history considered above are indicative of legislative intent and support the conclusion that the legislature intended to punish rape and felony murder separately. Accordingly, we would hold that Muhammad's rape and felony murder convictions do not violate double jeopardy.

## CONCLUSION

Seven members of this court agree that a cell phone ping constitutes a search under the state and federal constitutions. However, six members of this court agree that the ping was permissible, thus affirming the Court of Appeals in part. Five members of the court hold that Muhammad's first degree rape and felony murder convictions violate double jeopardy. Therefore, five members of this court reverse the Court of Appeals in part and remand to trial court for the dismissal of the lesser-included offense and for other proceedings consistent with our opinions.

_Wiggins, J._

WE CONCUR.

_Fairhurst, C.J._

_González, J._

_Owens, J._

No. 96090-9

GORDON McCLOUD, J.—This case presents two issues. First, we must determine whether a warrantless "ping" of Bisir Bilal Muhammad's cell phone violated his constitutional rights to be free from unreasonable searches and unwarranted invasions of his private affairs. U.S. CONST. amend. IV; WASH. CONST. art. I, § 7. Second, we must determine whether Muhammad's convictions for both felony murder based on rape *and* the underlying rape violate double jeopardy. U.S. CONST. amend. V; WASH. CONST. art. I, § 9.

As to the second issue, we hold that the trial court unconstitutionally subjected Muhammad to double jeopardy by punishing him twice for the same offense. We therefore reverse the Court of Appeals' decision on this point and remand to the trial court with instructions to dismiss the lesser included offense.

As to the first issue, a majority of this court agrees that the police generally must obtain a warrant before they ping someone's cell phone. This majority is reflected in the lead opinion, authored by Justice Wiggins, and in this opinion, which

1

concurs with the lead opinion on this point. However, the lead opinion argues that the warrant requirement was excused in this case by exigent circumstances. And the opinion authored by Justice Madsen argues that no warrant was required, regardless of whether exigent circumstances existed. Thus, a majority of this court agrees that the ping was justified for one reason or another. I respectfully dissent on this point because I do not believe that the State proved by clear and convincing evidence that exigent circumstances made it impractical to obtain a warrant in this case. I would reverse the Court of Appeals' decision on this point and remand to that court to determine what evidence should have been suppressed and whether any error in failing to suppress was harmless beyond a reasonable doubt.

FACTUAL AND PROCEDURAL BACKGROUND

In November 2014, a couple out for an early morning walk discovered a naked corpse lying by the side of the road and called the police. 2 Verbatim Tr. of Proceedings (VTP) at 287-89; Clerk's Papers (CP) at 71. An inspection of the corpse at the scene revealed numerous injuries suggesting foul play. CP at 93. The police eventually identified the victim as 69-year-old Ina Richardson. *Id.*

A friend of Richardson's informed the police that he had seen her at Albertsons the night before her body was discovered. 2 VTP at 269-70, 277. The police learned from an Albertsons surveillance video that a "very distinctive" vehicle was in the parking lot at the same time Richardson left the store. CP at 74, 220. The

2

video shows Richardson walking away from the store and toward the vehicle, but it then skips ahead approximately 25 seconds. 3 VTP at 545-46; CP at 74, 101, 220. By the time the video picks back up, Richardson can no longer be seen. 3 VTP at 546; CP at 81. The video shows the distinctive vehicle leaving the parking lot shortly afterward. CP at 101.

A few days later, Officer Boyd, who had watched the Albertsons surveillance video, spotted the "very distinctive" vehicle. 1 VTP at 71-73; CP at 101-02, 220-21. Boyd pulled the vehicle over and questioned the driver, Muhammad. 1 VTP at 74; CP at 102, 220-21. Boyd informed Muhammad that he was investigating a crime that had recently occurred in the Albertsons parking lot and that a vehicle matching Muhammad's had been seen in the vicinity. CP at 102, 220-21. Boyd did not tell Muhammad what crime he was investigating. *See id.* at 102. Muhammad denied being in the Albertsons parking lot on the night of the crime. 4 VTP at 743; CP at 102. Muhammad told Boyd that "as far as he knew," he had gone straight home after his shift at the Quality Inn. CP at 102; *see also* 4 VTP at 745. The trial court, after watching a video that is not part of the appellate record, described the stop as "very limited in nature, nonthreatening, [and] objectively congenial throughout." CP at 221.

After reporting his encounter to other officers, Boyd was asked to watch Muhammad's vehicle. CP at 102, 104-05. At one point, Boyd watched as

3

Muhammad and his wife made a trip from their home to Walmart and back. *Id.* at 102.

Meanwhile, back at the station, the investigation was gathering momentum. Officer Daniel learned from additional surveillance video that the distinctive vehicle seen in the Albertsons parking lot had come from the Quality Inn parking lot. *Id.* at 74. Officer Muszynski learned that Muhammad had "an extensive criminal history including rape." *Id.* at 105. And the medical examiner concluded that Richardson had been sexually assaulted and strangled to death. 3 VTP at 471-72; CP at 74. If he had not been a suspect before, Muhammad was a suspect now.

Based on this growing body of evidence, the police sought and obtained a warrant to seize and search Muhammad's vehicle. CP at 105; *see also id.* at 76 (warrant). However, for some unknown reason, Boyd had left his surveillance post and lost track of Muhammad's vehicle before the police could seize it. *Id.* at 102.

To figure out where Muhammad had gone, Boyd had Muhammad's phone company "ping" his cell phone. *Id.* at 102-03. The ping led the police to a nearby city in Idaho, where they found both Muhammad, who was working on a fence, and his vehicle. *Id.* at 95. The police seized the vehicle and gave Muhammad a ride back to the station, where they questioned him. *Id.* at 95-96. At this point, despite the investigation's growing momentum, the police opted not to place Muhammad under arrest. 1 VTP at 83, 94. Instead, the police gave Muhammad a ride home

after he asked for an attorney, and Muhammad remained free to go about his business. *Id.* at 82-83.

After taking Muhammad home, the police continued their investigation and uncovered sufficient additional evidence to arrest Muhammad, which they did. CP at 96-97. The police also searched the seized vehicle and found incriminating evidence in the trunk. 3 VTP at 491-96, 508; 4 VTP 658-59; CP at 95.

The State charged Muhammad with both first degree felony murder predicated on rape, in violation of RCW 9A.32.030(1)(c), and first degree rape, in violation of RCW 9A.44.040. CP at 22-23. A person is guilty of first degree felony murder when

> [h]e or she commits or attempts to commit the crime of . . . rape in the
> first or second degree, . . . and in the course of or in furtherance of such
> crime or in immediate flight therefrom, he or she, or another participant,
> causes the death of a person other than one of the participants . . . .[1]

RCW 9A.32.030(1)(c). The statute does not provide the elements of first degree rape; one must look to the cross-referenced "rape in the first or second degree" statute actually charged, RCW 9A.44.040, .050, for those.

Prior to trial, Muhammad moved to suppress the "results" of the ping. CP at 51; *see also* 1 VTP at 48-50. The State argued that exigent circumstances permitted the ping because the police were concerned that Muhammad might destroy evidence

---

[1] The statute goes on to describe a potential defense not at issue here.

or flee. 1 VTP at 58. The State also claimed that Muhammad presented a "threat to public safety." *Id.* at 59. The trial court agreed with the State. CP at 225. Specifically, the trial court ruled that the "officers could reasonably infer that the window for collection of evidence would be closing rapidly" because Muhammad "had reason to believe" that the police suspected him of "a violent crime." *Id.* at 223. The Court of Appeals affirmed on exigency grounds. *State v. Muhammad*, 4 Wn. App. 2d 31, 50, 419 P.3d 419, *review granted*, 191 Wn.2d 1019 (2018).

The jury found Muhammad guilty of both counts, CP at 395, and the trial court sentenced him separately for each offense, *id.* at 572. The Court of Appeals rejected Muhammad's claim that the double punishment violates double jeopardy. *Muhammad*, 4 Wn. App. 2d at 53.

## ANALYSIS

I.      Double Jeopardy

The double jeopardy clause of the United States Constitution provides that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb." U.S. CONST. amend. V. The Washington Constitution similarly provides that "[n]o person shall . . . be twice put in jeopardy for the same offense." WASH. CONST. art. I, § 9. We have stated that these two provisions "provide the same protections." *In re Pers. Restraint of Francis*, 170 Wn.2d 517, 522 n.1, 242 P.3d 866 (2010) (citing *In re Pers. Restraint of Davis*, 142 Wn.2d 165, 171, 12 P.3d 603 (2000)). The two

constitutional provisions "protect[] not only against a second trial for the same offense, but also 'against multiple punishments for the same offense.'" *Whalen v. United States*, 445 U.S. 684, 688, 100 S. Ct. 1432, 63 L. Ed. 2d 715 (1980) (quoting *North Carolina v. Pearce*, 395 U.S. 711, 717, 89 S. Ct. 2072, 23 L. Ed. 2d 656 (1969), *overruled on other grounds by Alabama v. Smith*, 490 U.S. 794, 798, 109 S. Ct. 2201, 104 L. Ed. 2d 865 (1989)).

Here, Muhammad does not allege that the State subjected him to multiple trials for the same offense but, instead, that it punished him twice for the same offense after a single trial. Specifically, Muhammad claims that he is being punished twice for a single rape: once for the independent crime of first degree rape and once for felony murder predicated on that same rape. In this context, "the Double Jeopardy Clause does no more than prevent the sentencing court from prescribing greater punishment than the legislature intended." *Missouri v. Hunter*, 459 U.S. 359, 366, 103 S. Ct. 673, 74 L. Ed. 2d 535 (1983). Thus, we must determine whether the legislature intended for the sentencing court to punish Muhammad for both felony murder based on first degree rape *and* the underlying rape. "Our review is de novo, and legislative intent is the touchstone." *State v. Kier*, 164 Wn.2d 798, 804, 194 P.3d 212 (2008) (citing *State v. Freeman*, 153 Wn.2d 765, 771, 108 P.3d 753 (2005)).

We hold that the legislature did not intend for the trial court to punish Muhammad for both felony murder based on first degree rape and the underlying rape. Thus, the two offenses merge. We also hold that the exception to the merger doctrine does not apply here. We therefore remand this case to the trial court with instructions to vacate the lesser offense of first degree rape.

> A. The offenses at issue must merge so that Muhammad is not subject to double jeopardy

In discerning legislative intent, we first "look to the language of the pertinent statutes to determine if they expressly authorize multiple punishments for conduct that violates more than one statute." *State v. Louis*, 155 Wn.2d 563, 569, 120 P.3d 936 (2005). Absent express authorization, we apply a rule of statutory construction known alternatively as the "same evidence" test, the "same elements" test, or the *Blockburger*[2] test. *Id.* The merger doctrine may also "help determine legislative intent, where the degree of one offense is elevated by conduct constituting a separate offense." *Kier*, 164 Wn.2d at 804 (citing *State v. Vladovic*, 99 Wn.2d 413, 419, 662 P.2d 853 (1983)). We end our analysis with one more look at legislative intent. *State v. Calle*, 125 Wn.2d 769, 780, 888 P.2d 155 (1995). If that intent remains unclear, then we apply the rule of lenity and vacate the conviction on the lesser

---

[2] *Blockburger v. United States*, 284 U.S. 299, 304, 52 S. Ct. 180, 76 L. Ed. 306 (1932).

8

offense. *State v. Jackman*, 156 Wn.2d 736, 751, 132 P.3d 136 (2006) (citing *State v. Adel*, 136 Wn.2d 629, 635, 965 P.2d 1072 (1998)).

We begin our analysis with the plain language of the statutes—where we look to see if the legislature expressly told us that both punishments are permissible. *Calle*, 125 Wn.2d at 776-77. For example, our legislature has expressly authorized multiple punishments for crimes committed during a burglary: "Every person who, in the commission of a burglary shall commit any other crime, may be punished therefor as well as for the burglary, and may be prosecuted for each crime separately." RCW 9A.52.050. Our legislature has not, however, similarly authorized multiple punishments under either the felony murder statute or the rape statute at issue here. *See* RCW 9A.32.030(1)(c) (felony murder); RCW 9A.44.040 (rape).

We turn next to the *Blockburger* test. *Jackman*, 156 Wn.2d at 746-47. Under this test, we compare the elements of the two offenses at issue to determine whether they are the same—the assumption being that the legislature "ordinarily does not intend to punish the same offense under two different statutes." *Whalen*, 445 U.S. at 691-92. "For double jeopardy purposes, a lesser included offense is the 'same offense' as the greater offense." *State v. Fuller*, 185 Wn.2d 30, 37-38, 367 P.3d 1057 (2016) (citing *Brown v. Ohio*, 432 U.S. 161, 168-69, 97 S. Ct. 2221, 53 L. Ed. 2d 187 (1977)). A "lesser included offense" is "[a] crime that is composed of some,

but not all, of the elements of a more serious crime and that is necessarily committed in carrying out the greater crime." BLACK'S LAW DICTIONARY 1301 (11th ed. 2019).

The merger doctrine is closely related. Under that doctrine, a lesser included offense merges "into a more serious offense when a person is charged with both crimes, so that the person is not subject to double jeopardy." BLACK'S LAW DICTIONARY at 1184; *see also Freeman*, 153 Wn.2d at 773 ("[W]e presume the legislature intended to punish both offenses through a greater sentence for the greater crime." (citing *Vladovic*, 99 Wn.2d at 419)).

> [T]he merger doctrine is a rule of statutory construction which only applies where the Legislature has clearly indicated that in order to prove a particular degree of crime (*e.g.*, first degree rape) the State must prove not only that a defendant committed that crime (*e.g.*, rape) but that the crime was accompanied by an act which is defined as a crime elsewhere in the criminal statutes (*e.g.*, assault or kidnapping).

*Vladovic*, 99 Wn.2d at 420-21.

First degree rape is unquestionably a lesser included offense of felony murder based on first degree rape. First degree rape is composed of some, but not all, of the elements of felony murder—in fact, the felony murder statute incorporates the elements of first degree rape by reference. RCW 9A.32.030(1)(c). In other words, the legislature has clearly indicated that in order to prove first degree felony murder, the State must prove not only that the defendant caused someone's death but also that the killing was accompanied by rape, which is defined as a crime elsewhere in

10

the criminal statutes. Thus, the two offenses are the same offense under *Blockburger*, and they must merge to avoid subjecting Muhammad to double jeopardy. *Cf. Whalen*, 445 U.S. at 693-94 (construing analogous statutes and concluding that felony murder based on rape and the underlying rape were the same offense under *Blockburger*).

Indeed, we have previously treated felony murder and the felony on which it is based as greater and lesser offenses that must merge. In *Francis*, the defendant attacked two people, Lucas and Jacobson, with a baseball bat, intending to steal $2,000. 170 Wn.2d at 521. Lucas died in the course of the robbery. *Id.* The defendant pleaded guilty to first degree felony murder of Lucas and attempted first degree robbery of Jacobson. *Id.* We held that these two offenses did not merge—but only because there were two victims. *Id.* at 527-28. We explained that the outcome would have been different with only one victim: "If Francis had pleaded to the attempted robbery *of Lucas* and felony murder *of Lucas*, double jeopardy would preclude conviction of the attempted robbery count." *Id.* at 527; *see also id.* at 530 ("[T]he prosecutor dropped the attempted robbery count *against Lucas* from the second amended complaint because it would have merged into the felony murder upon conviction."). Just last year, a unanimous court cited this portion of *Francis* approvingly. *In re Pers. Restraint of Schorr*, 191 Wn.2d 315, 325, 422 P.3d 451 (2018) (holding that first degree robbery conviction did not merge with first degree

11

murder conviction but only because defendant pleaded guilty to premeditated murder in addition to felony murder).

The State argues that the two offenses are not the same under *Blockburger*, noting that the felony murder statute, unlike the first degree rape statute, does not require a completed rape. Suppl. Br. of Resp't at 20. We recognize that because felony murder may be predicated on a felony other than rape, or on an attempted rape, a person could be convicted of felony murder without committing a completed first degree rape. RCW 9A.32.030(1)(c). But "[w]e consider the elements of the crimes *as charged and proved*, not merely as the level of an abstract articulation of the elements." *Freeman*, 153 Wn.2d at 777 (emphasis added); *see also Whalen*, 445 U.S. at 694 ("In the present case, however, proof of rape is a necessary element of proof of the felony murder, and we are unpersuaded that this case should be treated differently from other cases in which one criminal offense requires proof of every element of another offense."); *In re Pers. Restraint of Orange*, 152 Wn.2d 795, 817-19, 100 P.3d 291 (2004). Here, although the State charged Muhammad with felony murder based on either attempted or completed rape, CP at 22, the jury convicted Muhammad of completed rape, *id.* at 395. In fact, the State never even requested a jury instruction on attempt. *See id.* at 287-311. Because we consider the elements as charged *and proved*, *Freeman*, 153 Wn.2d at 777, we reject the State's abstract argument.

Although our analysis does not end here, the result of the *Blockburger* test "creates a strong presumption of the legislature's intent," and "[t]his presumption can 'be overcome only by clear evidence of contrary [legislative] intent.'" *Louis*, 155 Wn.2d at 570 (second alteration in original) (quoting *Calle*, 125 Wn.2d at 780). Requiring clear evidence of legislative intent is in accord with the rule of lenity, which we apply in double jeopardy cases. *Jackman*, 156 Wn.2d at 751; *Adel*, 136 Wn.2d at 634-35; *see also Whalen*, 445 U.S. at 695 n.10.[3] In this case, the Court of Appeals relied on our decision in *Calle* to overcome the *Blockburger* presumption. *Muhammad*, 4 Wn. App. 2d at 60-61 (discussing *Calle*, 125 Wn.2d 769). But *Calle* is distinguishable.

In *Calle*, a case involving the rape and incest statutes, we said that "clear evidence of contrary [legislative] intent" may overcome the *Blockburger* presumption. *Calle*, 125 Wn.2d at 780. Unlike the offenses at issue in the case at

---

[3] In *Ladner v. United States*, the United States Supreme Court considered whether a federal statute permitted two convictions rather than one a for single shotgun discharge that affected two federal officers. 358 U.S. 169, 171, 79 S. Ct. 209, 3 L. Ed. 2d 199 (1958). The Court held that the rule of lenity "means that the Court will not interpret a federal criminal statute so as to increase the penalty that it places on an individual when such an interpretation can be based on no more than a guess as to what Congress intended." *Id.* at 177-78. In *Bell v. United States*, the United States Supreme Court considered whether the Mann Act (former 18 U.S.C. § 2421 (1949)) permitted two convictions rather than one for a single trip transporting two women across state lines. 349 U.S. 81, 82, 75 S. Ct. 620, 99 L. Ed. 905 (1955). The Court held that "if Congress does not fix the punishment for a federal offense clearly and without ambiguity, doubt will be resolved against turning a single transaction into multiple offenses." *Id.* at 84.

bar, the offenses at issue in *Calle* were not the same under *Blockburger*. *Id.* at 778. Thus, the presumption in *Calle* was that the two offenses did *not* merge and that the defendant could be punished for both. We then turned to other indicators of legislative intent to determine whether any "clear evidence" could overcome the *Blockburger* presumption and bar the courts from imposing separate punishments. *Id.* at 780. We found none. Instead, we found "only support for our conclusion that the Legislature intended to punish incest and rape as separate offenses." *Id.* We reasoned that "the differing purposes served by the incest and rape statutes, as well as their location in different chapters of the criminal code, are evidence of the Legislature's intent to punish them as separate offenses." *Id.*

Here, we are looking for clear evidence that the two offenses are *not* the same, despite the *Blockburger* presumption to the contrary. As in *Calle*, we find no clear evidence sufficient to overcome the *Blockburger* presumption. Although the felony murder and rape statutes are located in different chapters of the criminal code, the felony murder statute explicitly cross-references the rape statutes. In contrast, the rape statute at issue in *Calle* did not cross-reference the incest statute, nor did the incest statute cross-reference the rape statute. *Id.* at 776 n.1 (quoting relevant statutes). When the legislature uses cross-references in statutes, the cross-referenced material is not truly located somewhere else; it is as if the legislature set out the cross-referenced material in full. *Cf. State v. Eckblad*, 152 Wn.2d 515, 519-22, 98

14

P.3d 1184 (2004) (denying vagueness challenge to statute that cross-referenced federal regulations). The legislature is merely saving trees, not revealing a clear intent to punish the same offense twice. And although the felony murder and rape statutes may serve different purposes when examined in isolation, this fact alone falls well short of the clear evidence of contrary legislative intent necessary to overcome the strong presumption that the two offenses at issue here are the same and must merge.

In sum, we hold that the legislature did not intend for the sentencing court to punish Muhammad for both felony murder based on first degree rape and the underlying first degree rape. At best, the legislative intent is unclear, and we apply the rule of lenity. The two offenses must merge (absent an exception to the merger doctrine) so that Muhammad is not subject to double jeopardy.

B. The exception to the merger doctrine does not apply here

The State argues that an exception to the merger doctrine applies and therefore the offenses should not merge. Suppl. Br. of Resp't at 21-24. Under this exception, a lesser conviction will not merge with the greater if "it involves some injury to the person or property of the victim or others, which is separate and distinct from and not merely incidental to the crime of which it forms an element." *State v. Johnson*, 92 Wn.2d 671, 680, 600 P.2d 1249 (1979). If the lesser crime "was not incidental but rather had an independent purpose, it falls within the described exception and

15

courts may impose separate punishment." *State v. Berg*, 181 Wn.2d 857, 866, 337 P.3d 310 (2014). For example, the felony murder and attempted robbery that did not merge in *Francis*, discussed above, could be said to have caused separate and distinct injuries: one victim was killed, and the other, separate victim was nearly robbed. If the same victim had been killed and robbed, however, the injuries would not have been separate and distinct, and the two offenses would have merged into one. *Francis*, 170 Wn.2d. at 527.

We detailed this exception to the merger doctrine in *Johnson*. There, the defendant was convicted of first degree rape, first degree kidnapping, and first degree assault. *Johnson*, 92 Wn.2d at 672. To convict the defendant of first degree rape, the State had to "prove not only that the defendant committed rape, but that the rape was accompanied by an act which is defined as a separate crime elsewhere in the criminal statutes"—such as kidnapping or assault. *Id.* at 675. This court explained that the kidnapping and assault "were intertwined with the rape," rather than separate and distinct from it. *Id.* at 680-81. We therefore held that the assault and kidna[p]ping convictions merged into the rape conviction, *id.*, explaining that the legislature intended to treat the underlying crimes as aggravating factors, elevating a lesser degree of rape to first degree rape. *Id.* at 676, 678.

We subsequently explained that our analysis in *Johnson* squared perfectly with the United States Supreme Court's analysis in *Whalen*. *Vladovic*, 99 Wn.2d at

419 (citing *Whalen*, 445 U.S. 684). The defendant in *Whalen* was convicted of the same crimes that Muhammad was convicted of here: "rape and of murdering the same victim in the perpetration of the rape." *Id.* We explained the United States Supreme Court's *Whalen* holding as follows: "[t]he Court held that since proof of rape was necessary to prove first degree murder under the statutory scheme, Congress had not authorized cumulative punishment for the rape and the killing committed in the course of the rape." *Id.*

Then, in *State v. Fagundes*, Division One of the Court of Appeals applied *Johnson* to an array of convictions similar to those pending before us: first degree felony murder predicated on first degree rape and first degree kidnapping. 26 Wn. App. 477, 485-86, 614 P.2d 198, 625 P.2d 179 (1980). The court noted that the underlying offenses, like those in *Johnson*, "operate[d] to enhance the degree of the murder." *Id.* at 485. The court also explained that "proof of the underlying felonies makes unnecessary the proof of premeditation otherwise required to support a first-degree murder conviction." *Id.* at 485-86. In accord with *Johnson*, a unanimous court held that "the underlying felonies of first-degree rape and first-degree kidnap[p]ing merged into the murder." *Id.* at 486.

More recently, and also unanimously, Division Three of the Court of Appeals held that attempted first degree robbery merges with first degree felony murder based on that attempted robbery. *State v. Williams*, 131 Wn. App. 488, 497-99, 128

17

P.3d 98 (2006), *adhered to on remand*, 147 Wn. App. 479, 195 P.3d 578 (2008). The court explained that "[t]he shooting had no purpose or intent outside of accomplishing the robbery or facilitating [the defendant's] departure from the scene." *Id.* at 499. The court noted felony murder's unique dependence on its predicate offense: if the predicate offense (e.g., attempted first degree robbery) is truly independent from the killing for purposes of the exception to the merger doctrine, then the fact finder cannot find that the killing was "in furtherance of or in flight from" that predicate offense. *Id.* And without that finding, a first degree felony murder conviction cannot stand. *Id.*; *see also* RCW 9A.32.030(1)(c) (felony murder statute).

Although *Johnson*, *Vladovic*, *Fagundes*, and *Williams* clearly and persuasively point us in one direction—the two convictions before us must merge—Division Two of the Court of Appeals has twice come out the other way. *See State v. Saunders*, 120 Wn. App. 800, 86 P.3d 232 (2004); *State v. Peyton*, 29 Wn. App. 701, 630 P.2d 1362 (1981). In the earlier of those two opinions, *Peyton*, the court held that the defendant's convictions for first degree robbery and first degree felony murder based on that robbery did not merge. *Peyton*, 29 Wn. App at 720. In that case, the State alleged that the defendant had robbed a bank and, while fleeing the scene, had shot and killed a pursuing officer. *Id.* at 704-05. With limited explanation, the court stated that the robbery was "a separate and distinct act

independent of the killing" and thus did not merge with the felony murder conviction. *Id.* at 720. The court did not explain how the killing could be "separate and distinct" from the robbery while simultaneously occurring "in the course of and in furtherance of [the robbery] or in immediate flight therefrom" the robbery, a necessary finding under the felony murder statute. *See id.* at 715 n.2 (quoting former RCW 9A.32.030(1)(c) (1975)).

In the latter of those two opinions, *Saunders*, a divided panel provided a more thorough analysis than the one found in *Peyton*. *See* 120 Wn. App. at 820-24. In that case, the defendant was convicted of first degree felony murder based on first degree rape, first degree robbery, and first degree kidnapping, along with all three of those underlying felonies. *Id.* at 808. The majority held that "the predicate crimes and the murder [were] not sufficiently intertwined for application of the merger doctrine" but were "separate and distinct from the murder." *Id.* at 822-24.

But the majority failed to reconcile its analysis of the merger exception with the felony murder statute. We have explained that the merger exception is reserved for offenses that are truly "separate and distinct"; it does not apply when the lesser offense is "merely incidental to" or "intertwined with" the greater. *Johnson*, 92 Wn.2d at 680-81; *see also Berg*, 181 Wn.2d at 866 (explaining that the lesser crime must have had an "independent purpose"). Meanwhile, the felony murder statute demands that a jury find that the death occurred "in the course of," "in furtherance

19

of," or "in immediate flight []from" the underlying felony. RCW 9A.32.030(1)(c). The underlying felony "'must at least have intimate relation and close connection with the killing, *and must not be separate, distinct, and independent from it.*'" *State v. Diebold*, 152 Wash. 68, 73, 277 P. 394 (1929) (emphasis added) (quoting 63 L.R.A. 368 (1904) and citing *Pliemling v. State*, 46 Wis. 516, 1 N.W. 278, 281 (1879)). So the exception to the merger rule applies only to separate, distinct, and independent offenses, while felony murder demands the exact opposite. The exception to the merger rule and felony murder are irreconcilable and cannot coexist.

The majority in *Saunders* avoided this result by reasoning that all three underlying felonies had a purpose other than facilitating murder. 120 Wn. App. at 820-24. For example, the majority explained that the purpose of the kidnapping was "to humiliate [the victim] and to retaliate for her refusal to comply with [the defendant's] sexual demands." *Id.* at 823. But when would the purpose of the underlying offense to felony murder ever be to "facilitate murder"? *Id.* at 822-24. "The purpose of the felony murder rule is to deter felons from killing *negligently or accidentally* by holding them strictly responsible for killings they commit." *State v. Leech*, 114 Wn.2d 700, 708, 790 P.2d 160 (1990) (emphasis added) (citing *People v. Washington*, 62 Cal. 2d 777, 781, 402 P.2d 130, 44 Cal. Rptr. 442 (1965); 2 WAYNE R. LAFAVE & AUSTIN W. SCOTT, SUBSTANTIVE CRIMINAL LAW § 7.5, at 210 (1986)). When a person negligently or accidentally kills somebody in the course of,

20

in furtherance of, or in flight from a robbery, rape, burglary, arson, or kidnapping, that person *by definition* did not commit the underlying crime to facilitate murder. It was an accident, albeit a criminal one. When it comes to felony murder, the lesser offense does not—and cannot—have a purpose independent from the greater; the purpose of the entire criminal endeavor is to commit the underlying felony.

On a related note, if the State believes that the defendant also intended to kill, then it may charge the defendant with a different form of murder. In fact, the State did just this in *Saunders*. There, the State charged the defendant with "intentional murder in the first degree or, in the alternative, felony murder based on rape, robbery, and kidnapping." *Saunders*, 120 Wn. App. at 808. Felony murder is generally easier to prove because "proof of the underlying felonies makes unnecessary the proof of premeditation otherwise required to support a first-degree murder conviction." *Fagundes*, 26 Wn. App. at 485-86. The jury found Saunders guilty of felony murder, not intentional murder. *Saunders*, 120 Wn. App. at 808. Based on this finding, the State failed to prove that the killing had any purpose independent from the underlying felonies, and the crimes should have merged.

The majority also reasoned that all three underlying felonies caused the victim injuries independent from the murder. *Id.* at 822-24. For example, the majority described injuries suffered by the victim during the course of the rape that were "distinguishable from the subsequent murder." *Id.* at 823. But when it comes to

21

felony murder, the injuries stemming from the underlying felonies are *not* distinguishable from the murder. Rather, the State must establish those injuries in order to prove the underlying felonies and, in turn, the felony murder based on those underlying felonies. The injuries are crucial to the entire prosecution; without them, the State cannot prove anything.

The dissent in *Saunders*, meanwhile, explained that the Court of Appeals is "bound" by *Johnson*, which is "directly on point" and requires that "one or more" of the underlying convictions "merge with the felony murder conviction." *Id.* at 827 (Morgan, J., dissenting in part) (citing *Johnson*, 92 Wn.2d 671).

We agree with the *Saunders* dissent. In the case before us, the degree of killing was raised to first degree murder by conduct separately criminalized by the legislature: rape. Thus, the legislature presumably intended to treat the underlying felony as an element that elevated the killing to first degree murder, and the two offenses must merge. And this presumption is not overcome by the exception to the merger doctrine. The underlying rape was intertwined with the killing—the jury necessarily found that the killing occurred in the course of, in furtherance of, or in immediate flight from that rape and all its horrible effects.[4] And the rape did not

---

[4] The Court of Appeals in this case claimed that the rape "was not integral" to the murder and that "the murder did not effectuate or coincide with the rape." *Muhammad*, 4 Wn. App. 2d at 66. This is entirely inconsistent with the jury's finding that Muhammad caused Richardson's death "in the course of," "in furtherance of," or "in immediate flight

have a purpose independent from the killing—the jury convicted Muhammad of felony murder, meaning it found no purpose other than that which was required to prove the underlying felony. The exception to the merger doctrine does not apply, and the superior court must vacate the first degree rape conviction.

C.     Article I, Section 7

I concur with the lead opinion that under both the state and federal constitutions, absent a carefully drawn and jealously guarded exception, an officer needs a valid warrant to obtain both historical and real-time cell site location information (CSLI). As the lead opinion explains in persuasive detail, "[h]istorical and real-time CSLI . . . reveal an intensely intimate picture into our personal lives," lead opinion at 12, and thus the State generally must have a warrant to obtain it. However, I write separately because I believe that the lead opinion applies much too broad of an exception to the warrant requirement in the name of exigent circumstances.

Our constitution demands that officers obtain a warrant before they disturb a person's private affairs. WASH. CONST. art. I, § 7; *State v. Hinton*, 179 Wn.2d 862,

---

from" the rape. CP at 383, 395; *see State v. Hacheney*, 160 Wn.2d 503, 506, 158 P.3d 1152 (2007) ("[F]or a death to have occurred in the course of a felony, there must be a causal connection such that the death was a probable consequence of that felony." (citing *State v. Golladay*, 78 Wn.2d 121, 131, 470 P.2d 191 (1970), *overruled on other grounds by State v. Arndt*, 87 Wn.2d 374, 378, 553 P.2d 1328 (1976); *Diebold*, 152 Wash. at 72)).

868-69, 319 P.3d 9 (2014). An officer may avoid this constitutional demand only if the search "falls within one of the jealously guarded and carefully drawn exceptions to the warrant requirement." *Hinton*, 179 Wn.2d at 868-69. "The State bears a heavy burden to show the search falls within one of the 'narrowly drawn' exceptions." *State v. Garvin*, 166 Wn.2d 242, 250, 207 P.3d 1266 (2009) (quoting *State v. Jones*, 146 Wn.2d 328, 335, 45 P.3d 1062 (2002)).

One jealously guarded and carefully drawn exception is for exigent circumstances. *State v. Cuevas Cardenas*, 146 Wn.2d 400, 405, 47 P.3d 127, 57 P.3d 1156 (2002). Under this exception, the warrant requirement "must yield" if "exigent circumstances demand that police act immediately." *Id.* (citing *Warden, Md. Penitentiary v. Hayden*, 387 U.S. 294, 298-99, 87 S. Ct. 1642, 18 L. Ed. 2d 782 (1967); *State v. Terrovona*, 105 Wn.2d 632, 644, 716 P.2d 295 (1986)). Exigent circumstances arise when "'obtaining a warrant is not practical because the delay inherent in securing a warrant would compromise officer safety, facilitate escape or permit the destruction of evidence.'" *State v. Smith*, 165 Wn.2d 511, 517, 199 P.2d 386 (2009) (quoting *State v. Audley*, 77 Wn. App. 897, 907, 894 P.2d 1359 (1995)). Courts should keep in mind that "law enforcement may promptly gain a search warrant through telephone calls to a judge at nearly any time of day." *Muhammad*, 4 Wn. App. 2d at 52.

The lead opinion correctly recites five circumstances that could be deemed exigent and the six factors that might be useful to determine whether an exigency exists. Lead opinion at 22. But at the end of the day, we "look[] to the totality of the circumstances." *Id.* (citing *Smith*, 165 Wn.2d at 518). The State must prove by clear and convincing evidence that the officers had no choice but to act immediately and without a warrant. *Garvin*, 166 Wn.2d at 250 (citing *State v. Smith*, 115 Wn.2d 775, 789, 801 P.2d 975 (1990)). To satisfy its heavy burden, the State must "'point to specific, articulable facts and the reasonable inferences therefrom which justify the intrusion.'" *State v. Coyle*, 95 Wn.2d 1, 9, 621 P.2d 1256 (1980) (quoting *State v. Diana*, 24 Wn. App. 908, 911, 604 P.2d 1312 (1979)). Generally, this means that the State must show either that the police had "specific prior information" that the suspect had planned to flee or destroy evidence, or that the police were "'confronted with some sort of contemporaneous sound or activity alerting them' to the possible presence of an exigent circumstance." *Id.* at 10 (quoting *State v. Mueller*, 15 Wn. App. 667, 670, 552 P.2d 1089 (1976)). But the facts must be specific and the inferences reasonable—mere suspicion is insufficient. *Id.* at 9-10.

I agree with the lead opinion that in general, the circumstance at issue here is one that might be deemed exigent: Muhammad's vehicle was mobile and potentially

contained evidence of a serious crime.[5] Lead opinion at 23. I also agree with the lead opinion that the nature of the offense at issue was grave and violent, satisfying one of the six factors. *Id.* But that is the extent of my agreement.

The State claims that Muhammad "would likely destroy evidence and escape unless the officers acted quickly." Suppl. Br. of Resp't at 9. This claim is unsupported by specific, articulable facts.

First of all, the police were clearly not concerned with Muhammad escaping. Indeed, after finding Muhammad in the field, based on the ping, and then questioning him at the station, the police did not arrest or even detain him: *they drove Muhammad home.* 1 VTP at 82-83. That doesn't sound very exigent.

Second, the police had no prior information that Muhammad planned to destroy evidence or flee. *Coyle*, 95 Wn.2d at 10. Nor were they confronted with any contemporaneous activity alerting them that Muhammad was carrying out plans to destroy evidence or to flee. *Id.* Instead, the police lost sight of a suspect in the midst of an ongoing investigation. A generalized fear that an out-of-sight suspect

---

[5] The lead opinion also says that "Muhammad was in flight." Lead opinion at 23. But he wasn't—he was working on a fence in a neighboring community. CP at 95. And although the police may have worried that he was in flight, mere suspicion is insufficient to prove exigency. *Coyle*, 95 Wn.2d at 9-10. The lead opinion also notes that "Muhammad's vehicle disappeared *only after* police discontinued surveillance," suggesting that he was on the run. Lead opinion at 24. But the fact that Muhammad did not leave until after Officer Boyd had left his surveillance post means nothing absent something in the record suggesting that Muhammad knew that he was being surveilled in the first place.

might be on the run or out destroying evidence is insufficient to prove by clear and convincing evidence that exigent circumstances made it impractical to obtain a warrant. Our jealously guarded and carefully drawn exigency exception to the warrant requirement demands more.

The State also claims that Muhammad "posed a danger to the public." Suppl. Br. of Resp't at 9. Of course, public safety is always the paramount concern of the police. But this concern cannot override constitutional protections of privacy, effectively swallowing the warrant requirement. The police cannot ignore the constitutional rights of a suspect, no matter how heinous the crime being investigated, and rationalize away the constitutional violation as one that kept the public safe. Instead, the State must provide specific, articulable facts that exigent circumstances made obtaining a warrant impractical at the time of the privacy violation.[6] Generic references to public safety do not meet that standard.

Under our "nearly categorical" exclusionary rule, *State v. Winterstein*, 167 Wn.2d 620, 636, 220 P.3d 1226 (2009), we require "the suppression of evidence obtained in violation of article I, section 7, with no exceptions that rely on speculation, the likelihood of deterrence, or the reasonableness of official misconduct." *State v. Mayfield*, 192 Wn.2d 871, 888, 434 P.3d 58 (2019). Thus, the

---

[6] Relatedly, the court must focus its analysis on the facts as they existed at the time of the violation.

next questions are what evidence was obtained in violation of that constitutional privacy protection, and whether the error of failing to suppress that evidence and its fruits was harmless beyond a reasonable doubt.

Neither the trial court nor the Court of Appeals answered those questions because they concluded that the warrantless ping was lawful. CP at 218-26; *Muhammad*, 4 Wn. App. 2d at 50. I would remand this case to the Court of Appeals with instructions to determine what evidence should have been suppressed as a direct result or fruit of the unconstitutional ping (i.e., the poisonous tree) and whether any error in failing to suppress that evidence was harmless beyond a reasonable doubt. *See* RAP 13.7(b) ("If the Supreme Court reverses a decision of the Court of Appeals that did not consider all of the issues raised which might support that decision, the Supreme Court will either consider and decide those issues or remand the case to the Court of Appeals to decide those issues."). I believe that this is the proper route, particularly in light of *Mayfield*, 192 Wn.2d 871, an opinion published after the Court of Appeals ruled in this case.

CONCLUSION

The trial court punished Muhammad twice for the same offense in violation of state and federal constitutional protections against double jeopardy. A majority of this court therefore reverses the Court of Appeals' decision on this point and remands to the trial court to dismiss the lesser included offense.

28

A majority of this court further agrees that a "ping" is a search that must be supported by a warrant or by one of the few carefully crafted and jealously guarded exceptions to the warrant requirement. The lead opinion argues that one of those exceptions, for exigent circumstances, applies here. I respectfully disagree; I would hold that the State failed to carry its burden of proving that exception, and I would reverse the Court of Appeals on this point but remand to that court to address the difficult remaining questions of what evidence should have been suppressed and whether failure to suppress was harmless beyond a reasonable doubt. I therefore respectfully dissent on that point only.

_Gordon McCloud, J._

_Yu, J_

_Stephens, J._

No. 96090-9

MADSEN, J. (concurring/dissenting)—Seven members of this court agree that a defendant has a privacy interest in his or her location in the public sphere, preventing law enforcement from "pinging" a person's cell phone without a warrant unless it falls under one of our narrowly drawn exceptions to the search warrant requirement. Since exigent circumstances existed in the present case, the lead opinion argues the "ping" was justified. While I agree that the "ping" was justified, I disagree that a warrant was required here, regardless of exigency. In my view, real-time CSLI (cell-service location information) is analogous to serendipitous encounters with any other person while traversing public highways. At any point in time, a person's location may be generally revealed while traveling in the public sphere. Because a person does not have a privacy right to his or her real-time location, I would hold the "ping" was justified, regardless of whether a search warrant was executed.

I disagree, however, with the lead opinion's conclusion that cumulative punishments for felony murder and rape do not violate double jeopardy. As charged, all the elements of first degree rape are included in felony murder predicated on the rape. As

such, the crimes constitute one offense under *Blockburger*.[1] I therefore agree with Justice

Gordon McCloud that felony murder and first degree rape must merge to protect Bisir

Bilal Muhammad from multiple punishments for a single crime. Accordingly, I concur

with the lead opinion regarding exigent circumstances and Justice Gordon McCloud's

opinion on the issue of double jeopardy.

Discussion

Article I, section 7 of the Washington State Constitution provides that "[n]o

person shall be disturbed in his private affairs, or his home invaded, without authority of

law." It is well settled that article I, section 7 is more protective than the Fourth

Amendment to the United States Constitution. A search under article I, section 7 occurs

when "those privacy interests which citizens of this state have held, and should be

entitled to hold, safe from governmental trespass." *State v. Myrick*, 102 Wn.2d 506, 511,

688 P.2d 151 (1984). The threshold question, thus, is whether the real-time CSLI is a

"private affair." To determine that, we look at the "nature and extent of the information

which may be obtained as a result of the governmental conduct." *State v. Miles*, 160

Wn.2d 236, 244, 156 P.3d 864 (2007).

The lead opinion concludes that our "prior precedent demonstrates that CSLI is a

'private affair,'" arguing that CSLI goes beyond "'augment[ing] [an officer's] senses,'"

and likens obtaining location information to searching through personal text messages on

---

[1] *Blockburger v. United States*, 284 U.S. 299, 304, 52 S. Ct. 180, 76 L. Ed. 306 (1932).

a cell phone. Lead opinion at 9, 10. But the cases cited by the lead opinion for support are very different from the use of a "ping" to obtain real-time CSLI.

For example, the lead opinion cites to the line of cases that held technology that go beyond lightly augmenting an officer's senses constitutes a search. *See id.* But these cases are inapt. In *State v. Jackson,* we were concerned with the use of precise location technology that can record a person's movement through "uninterrupted, 24-hour a day surveillance." 150 Wn.2d 251, 262, 76 P.3d 217 (2003). This type of surveillance is particularly intrusive because it is "unlikely that the sheriff's department could have successfully maintained uninterrupted 24-hour surveillance [for two and one-half weeks]." *Id.* A person does not reasonably expect to be surveilled over the course of several weeks with every movement tracked in his or her personal vehicle. Thus, we rejected the use of GPS (global positioning system) technology to surveil the historical movements of an individual. The same concern was raised in *State v. Young,* where we rejected the use of thermal imaging surveillance to detect heat patterns inside a home without the execution of a warrant. 123 Wn.2d 173, 182-84, 867 P.2d 593 (1994). We rejected the use of such technology without a warrant because when a person resides in a home, that person would not expect his or her walls to be transparent for any law enforcement officer to observe what goes on behind closed doors.

This same rationale was applied to stored files on a personal cellular device where a citizen does not reasonably expect that his or her personal device could be accessed at any time should the government wish to peruse the contents stored in a person's cell

3

phone. Thus, we required law enforcement to obtain a warrant to access personal text messages in *State v. Hinton*, likening those conversations to "phone calls, sealed letters, and other traditional forms of communication that have historically been strongly protected under Washington law." 179 Wn.2d 862, 869-70, 319 P.3d 9 (2014).

Here, rather than prolonged government surveillance, or historical cataloging of an unsuspecting private citizen's movements over a period of time, what is at stake is freely transmitted data that a person voluntarily gives in exchange for unfettered and instantaneous use of a personal device. When a person chooses to carry a cell phone, he or she knowingly exchanges the device's location information for on-demand use of the phone's cellular activities. Thus, at any given time while one traverses the public sphere, that person is able to use all cellular functions of the device as it communicates with nearby cell towers. A private citizen is not unaware of this interaction because he or she knows that in order for the cell phone to function, it must *physically* be in range of the cell towers, thereby revealing generally the phone and its owner's current location in the public sphere.

Moreover, CSLI is not so precise as to raise concerns of the technological exactitude raised with GPS tracking devices on personal vehicles. Rather than pinpointing an individual's exact location, CSLI provides a generalized location area. As noted in *Carpenter v. United States*, CSLI is a combination of what cell site was used to connect to a phone and what antenna made that connection to create a record. ___ U.S. ___, 138 S. Ct. 2206, 2225, 201 L. Ed. 2d 507 (2018) (Kennedy, J., dissenting). "By

4

linking an individual's cell phone to a particular 120- or 60-degree sector of a cell site's coverage area at a particular time, cell-site records reveal the general location of the cell phone user." *Id.* Importantly, the record is "imprecise, because an individual cell-site sector usually covers a large geographic area," meaning that "in urban areas[,] cell-site records often . . . reveal the location of a cell phone user within an area covering between around a dozen and several hundred city blocks." *Id.* "In rural areas[,] cell-site records can be up to 40 times more imprecise. By contrast, a [GPS] can reveal an individual's location within around 15 feet." *Id.*

It is important to note the imprecision of this technology. Real-time CSLI simply provides a generalized location of where a cell phone may be. This does not come close to revealing the private details of a person's activities, as in *Jackson* or *Young*. The police are still required to respond to that location to determine the actual location of the individual. This is precisely what occurred here. *See* 1 Verbatim Tr. of Proceedings at 57. The lead opinion's fears of Orwellian government surveillance resulting from real-time CSLI use is unwarranted at this stage of the technology. Our job is to consider the facts and circumstances in this case and evaluate whether a person has a protectable privacy interest by considering "the nature and extent of the information which may be obtained as a result of the governmental conduct." *Miles*, 160 Wn.2d at 244. The only information that is revealed with the "ping" here is the current, general location of defendant's vehicle.

5

Finally, reliance on *Carpenter*, related to real-time CSLI, is improper here as well. At issue before that Court was a comprehensive collection of CSLI records *over a period of time*. There the Court found a privacy interest related to that collection of location records that could paint a picture of a person's daily movements, similar to having 24-hour surveillance on a private citizen. Important here is that the majority in *Carpenter* explicitly declined to extend application of its holding outside of CSLI records. 138 S. Ct. at 2220 ("Our decision today is a narrow one. We do not express a view on matters not before us: real-time CSLI or 'tower dumps' (a download of information on all the devices that connected to a particular cell site during a particular interval)."). Real-time CSLI is not a historical record of a person's movements, nor is it precise in tracking and cataloging a person's movements. The extension of *Carpenter* to the case before us is unwarranted. For the reasons discussed above, I would hold that there is no privacy interest in real-time CSLI under article I, section 7 or the Fourth Amendment.

Turning to double jeopardy, I agree with Justice Gordon McCloud. Because felony murder encompasses all of the elements of first degree rape, they constitute one crime. *See Blockburger*, 284 U.S. at 304. Murder is not felony murder without the underlying felony. Therefore, rape must merge into the more serious offense of felony murder so that Muhammad is not subject to multiple punishments for a single crime as proscribed by the double jeopardy clause of our federal and state constitutions. Opinion of Gordon McCloud, J., at 8-10; U.S. CONST. amend. V; WASH. CONST. art. I, § 9.

## Conclusion

Real-time CSLI provides a generalized location of a person's cell phone location but still requires police officers to respond to the area and actually locate the individual. Such technology does not provide pinpoint accuracy of a person's location akin to GPS technology and does not reveal private information or a historical record of a person's activities. Moreover, a person freely transmits data from his or her phone for unfettered access to a phone's suite of capabilities, thereby voluntarily providing a general physical location to a cell tower. I would hold a warrant was not required here because an individual does not have a reasonable expectation of privacy in real-time CSLI. I would also hold that because the offenses for felony murder and rape are one offense for the purposes of double jeopardy, they must merge. Respectfully, I concur in part and dissent in part.

Madsen, J.